It was in evidence that the deceased, before leaving his store about 12:20 at night, took from the money drawer all the cash therein, about $225 having been taken in that day; besides there was in the drawer the cash taken in for three or four days previously, and that when his body was found there was only $3 in his hip pocket; that on Tuesday before the homicide the prisoner left his boarding-house because he could not *Page 430 
pay his board bill, and was in the habit of borrowing small sums of money and pawning his effects; that on that Saturday afternoon he went to his boarding-house, and, being asked to pay his bill, said that he would pay on Monday morning; that at 10:30 that night he went to a barber shop and asked to be shaved on credit; that at 3:30 that afternoon he borrowed 75 cents to buy a pair of shoes; that about 12:30 (365) that night the prisoner asked the witness Barton to exchange suits with him, and Barton let him have his coat, and about 2 o'clock that night he was awakened by the prisoner, who took off his pants and put on another pair, and that at the prisoner's invitation the witness went with him to several places "to have a big time"; that on objection by Barton that he had no money, the prisoner then replied that he had plenty of money and would pay all expenses; they visited several places, and the prisoner spent considerable money, besides giving the witness $10. On his return the prisoner seemed much excited and nervous, and during the night repeatedly insisted on the witness leaving town with him. The witness and the prisoner were arrested early the next morning, and just before the arrest the prisoner said to the witness that if anything got out and the witness said anything about it, he (the prisoner) would shoot him.
It appears from the testimony of the officers that when the witness Barton and the prisoner were arrested $10.55 was taken from Barton and $407.50 from the prisoner; that the prisoner said when arrested that he did not know how much money he had, and the prisoner's pants, which Barton testified he had taken off and put in a drawer, on his return, had fresh blood on them; the shoes taken from the prisoner were the same which he had bought with the 75 cents borrowed from Barton and fitted the tracks found near the body, the tracks showing the five bars which were on the shoes; one of the shoes had blood spots on it. There were other circumstances in evidence, several witnesses testifying that they saw the prisoner about 12 o'clock that night, or shortly thereafter, in the vicinity of the place where the deceased was murdered, some of them noticing the change in his clothing, and that between 11 and 12 o'clock the prisoner had tried to borrow a pistol. Barton further testified that when they were arrested and taken to the police station the prisoner beckoned him into the toilet-room and suggested how he should obtain testimony as to how the prisoner had obtained money. The driver of the patrol wagon testified that the prisoner beckoned to Barton and they went together into the toilet-room. The chief of police testified that Barton in the prisoner's presence gave substantially the same recital of the circumstances which he testified to on the stand. The prisoner in his own behalf gave his account of his movements that evening, which it is not necessary to recite, and accounted for his money *Page 431 
by saying that he had been saving it up for some time to go to Hot Springs, Arkansas, for treatment of a disease, and that he had put his money around in different places from time to time; that he hid some money in a mattress at his boarding-house; that he pulled a plank off a store and had concealed some money there, and that he had hidden money between Riles' store and the alley, and that that evening he had gone around and collected up the money thus hidden. It is unnecessary to state the evidence more in detail.
There are no exceptions to the evidence. Exceptions 1, 2, and 3 are to the refusal of the court to give three special instructions requested as to circumstantial evidence.
The first request was to charge that "Where the State relies wholly upon circumstantial evidence for conviction it is incumbent upon the State to establish each circumstance beyond a reasonable doubt. In this case the State alleges that the deceased was murdered by the defendant, the motive being robbery; and it alleges that the money taken from the defendant's person and also off the witness Barton was the identical money that was taken from the deceased at the time of his murder. Therefore, the State must satisfy you beyond a reasonable doubt, first, that the deceased had at lease $417.50 on his person at the time of the murder, and that the money taken from the defendant and also from the witness Barton is the identical money that the deceased had. If the State has not so satisfied you, you will return a verdict of not guilty."
The court could not give this charge as asked. This is not an indictment for robbery, and if it were, it would not be necessary to prove the identical amount charged. The court in the charge correctly instructed as to circumstantial evidence all that the prisoner could have asked, as follows: "Each essential and material fact relied upon by the State must be established beyond a reasonable doubt." The court also charged as to circumstantial evidence: "When such evidence is relied upon to convict, it should be clear, convincing, and conclusive in all its combinations, and should exclude all reasonable doubt as to guilt." And further: "In passing upon such evidence it is the duty of the jury to consider all the circumstances and determine whether they have been established beyond a reasonable doubt." This was a sufficient compliance with the prayer. S. v.Brackville, 106 N.C. 701.
The second exception is to the refusal of the court to charge that "Where circumstantial evidence connected the prisoner with the crime, *Page 432 
each circumstance depends upon the truth of the preceding one, and the chain is no stronger than its weakest link, and, when once broken, becomes a rope of sand." The prisoner further asked the court to charge, as an application of the principle, that unless the State satisfies the jury that the prisoner did not have the money hid out, as he said, and that the money which he had when arrested was the identical money which the deceased had on his person when he was murdered, and that the prisoner and no one else murdered him and took his money, the jury should return a verdict of not guilty. But this was not a case (367) calling for the application of the principle stated. In S. v. Neville, 157 N.C. 596, Mr. Justice Walker said: "There was no chain of circumstance in this case which required the court to tell the jury that each circumstance which constituted a link must be established to their full satisfaction. A chain is no stronger than its weakest link, it is true; but there is no series of facts in this case necessary to be considered by the jury in order to convict the defendant."
In S. v. Fleming, 130 N.C. 689, the refusal of the court to charge, "Every link in the chain of evidence must be proved beyond a reasonable doubt," was sustained when in lieu thereof the court instructed the jury, as in this case, that the State must establish every circumstantial fact upon which it relies, beyond a reasonable doubt. In S. v. Shines,125 N.C. 730, the Court said: "There are cases of circumstantial evidence in which each circumstance depends upon the truth of the preceding one, in which case the evidence may be likened to a chain, which is no stronger than its weakest link. But usually that simile is inapplicable. Ordinarily, the circumstances accumulate, each one by itself being of no great strength, but like the bundle of twigs in the fable, or the several strands twisted into a rope or cable, becoming, when united, of great strength," but citing several cases. Even when a charge giving the simile of a chain may be properly used, it refers only to the necessary links in the chain of evidence. S. v. Carson, 115 N.C. 743; S. v. Crane, 110 N.C. 530.
The third exception is to the refusal of the court to charge in the identical words of the prayer: "Where circumstantial evidence is wholly relied upon by the State for conviction, as in this case, the circumstances so relied upon must be so clear and convincing as to point unerringly to the guilt of the defendant, and must exclude every possibility of his innocence." The court in its charge substantially complied with this request, saying: "Do these circumstances exclude from your conclusion everything except that of guilt?" And, "Such facts (essential or material facts) so established must not only be consistent with the defendant's guilt, but those facts must be inconsistent with the defendant's innocence and exclude every reasonable hypothesis of his *Page 433 
innocence." The whole charge is carefully expressed and fully conveys the idea set out in the prisoner's prayer, often repeated.
Exception 4 was for the refusal of the court to grant a new trial on account of alleged improper conduct of the jurors. The matters alleged were that the jurors were permitted to sleep in separate rooms and to read newspapers containing accounts of the trial, and that the hotel bell-boy was admitted to the rooms while the jurors were occupying them. The court found as facts that "The jurors were properly kept together and in the custody of an officer during the day, but that at night they occupied five adjoining rooms on the same floor. The jurors were allowed to occupy five rooms on account of (368) oppressive heat. No persons had access to such rooms except the maid at the hotel and the bell-boy, and the jurors communicated with no one except to order water from the bell-boy. No juror read any newspaper during the trial." The court further found that "while the conduct of the officer in keeping the jury in five different rooms was improper, yet no harm came to the prisoner on this account."
The requirement that the jury should be held together is not statutory, but the practice of the courts in order to prevent the jury being tampered with. It must receive a reasonable construction. There must be necessarily some separation, for the jurors do not all sleep in one bed, and in the dining-room, where there are small tables, they cannot sit at the same table; but it is sufficient if they are segregated from mingling with the crowd, and there are other occasions which necessarily require the temporary retirement of a juror from the body of his fellows. On this occasion, owning to the heat and possibly from the difficulty of procuring a sufficiently large room, the jurors occupied five adjoining rooms, and from the testimony those five rooms were on the same floor and segregated from the rest of the rooms on that floor by a bath room and toilet, "setting off this lot of rooms from any of the other rooms in the building," and all five rooms opened on the same hall. The judge finds as a fact that the jurors did nothing improper during the trial and communicated with no one except to order ice water from the bell-boy. There was no impropriety in this, any more than in speaking to the waiter at the table to bring water or dishes.
Even if the judge were correct in finding that it was improper for the jurors, under the circumstances, to occupy five adjoining rooms opening upon the same hall, still he finds that there was no communication with outsiders (except with the bell-boy, as stated), and that no harm accrued to the prisoner.
It has been uniformly held that when the circumstances are such as merely to put suspicion on a verdict (which was not the case here) by showing, not that there was any undue influence, but merely opportunity, *Page 434 
the granting of a new trial rests in the discretion of the trial judge. This was fully discussed and decided in S. v. Tilghman, 33 N.C. 553, and very numerous cases in the citations thereto in the Anno. Ed. Among many in point are S. v. Brittain, 89 N.C. 504, and S. v. Crane, 110 N.C. 537, and cases there cited, and S. v. Morris, 84 N.C. 765, and citations in the Anno. Ed. At this term the Court has reiterated, in Lewis v. Fountain,168 N.C. 277, and in Cook v. Highland Hospital, 168 N.C. 250, that where the circumstances are such as merely to put suspicion on the verdict because there was opportunity and a chance for misconduct, this is not sufficient to set aside the verdict, unless (369) there was in fact misconduct. When there is merely matter of suspicion it is purely in the discretion of the presiding judge, citing Moore v. Edmiston, 70 N.C. 481; S. v. Brittain supra; Baker v.Brown, 151 N.C. 17, and S. v. Tilghman, supra. In Baker v. Brown this proposition is fully discussed and sustained by Walker, J. In S. v. Harper,101 N.C. 761, where eleven of the jurors went to dinner under charge of an officer, and the other remained in his room under the charge of a sworn deputy, but the court found there was no effect on the verdict caused thereby, this Court sustained the judge below in refusing to set aside the verdict. That case was a conviction of a felony, though not capital.
Under the ancient common law, after the jury were charged they were kept together, both in civil and criminal cases, "as if they were prisoners, until they are discharged." Bannister, J., in Bishop of N. v. the Earl ofKent, 14 Henry VII., ch. 29, quoted by Thompson and Merriam on Juries, sec. 310. In those times trials of causes lasted but a single day, and the power of the court to adjourn from day to day to give jurors opportunity for rest and refreshment was doubted or denied. Indeed, the jurors were denied "meat and drink" until they had agreed. In modern times there has been a great amelioration, owing to the greater intelligence of the jurors, the greater respect for their intelligence, and the changed conditions of modern times. Indeed, in civil cases, the separation of a jury after being charged, though without leave of the court, before they have agreed upon their verdict, is not now, as a mere matter of law, ground for a new trial. Thompson and Merriam on Juries, sec. 315. In some of the States this has been extended to prosecutions for felony and even in capital cases. Thompson and Merriam, sec. 318. In this State the jury in felony cases, after the charge, are required to be kept together, though there are many instances in which the jurors have been and must be permitted to separate during the progress even of a capital trial, under the charge of sworn officers. One or more of the jury in a capital case have been permitted, in some States, to visit their homes under the charge of a sworn officer. See *Page 435 
Thompson and Merriam, sec. 321, and cases there cited. We would not be understood as approving or encouraging such practice. We merely hold, in this case, that on the facts found there was no legal separation, and that even if there was, the judge having found that there was no communication with outsiders and that no harm accrued to the prisoner, he properly refused to grant a new trial. It will be noted that there is a distinction between the discharge of a jury before verdict and a temporary separation, for purposes of necessity, or a quasi separation as in this case, where the jury is really still kept separate from outsiders and the judge finds that no prejudice accrued to the prisoner.
The prisoner also excepted to the refusal of the court to grant (370) a new trial on the allegation that the prisoner was under the influence of an opiate during a part of the trial. The court finds as facts that while the court was charging the jury the defendant was asleep a part of the time, but that the court did not know of the fact, and that the counsel of the prisoner did and failed to call the attention of the court thereto; that late one afternoon during the trial the court discovered that the prisoner did not seem to be right, and at once adjourned court for the afternoon and had the prisoner examined by the county physician, who the nest morning reported him in good condition; that then the trial proceeded, and the judge, with the aid of the county physician, observed the condition of the defendant thereafter during the trial, and that he was in full possession of all his faculties and entirely capable of conducting his defense; that if he was under the influence of an opiate at any time it was smuggled to him without the knowledge of the officers and was taken by him voluntarily. Though the court finds that the prisoner appeared drowsy at times, it also found that he was throughout the trial in full possession of all his faculties and capable of conducting his defense. The court could not have taken more precautions than the careful judge appears to have taken in behalf of the prisoner in this case.
The refusal of the court to grant a new trial for newly discovered testimony rested in his discretion, and is not reviewable. S. v. Jimmerson,118 N.C. 1173; S. v. DeGraff, 113 N.C. 690; S. v. Morris, 109 N.C. 820. The findings of fact by the court on such motion are not reviewable.S. v. DeGraff, 113 N.C. 690; S. v. Morgan, 120 N.C. 563; S. v. Lance,109 N.C. 789; S. v. Dunn, 95 N.C. 697.
This Court has uniformly held that "a petition to rehear, or to grant a new trial, for newly discovered testimony cannot be entertained in this Court in criminal actions." S. v. Ice Co., 166 N.C. 404, citing numerous and uniform decisions. After careful consideration of all the assignments of error and scrutiny of the entire record, we find no error. *Page 436 
We note that this trial was had in June, 1914. Under the statute and rules of the Court this appeal was required to be docketed at the Fall Term of this Court before the call of the docket of the district to which it belongs, under penalty of dismissal. Rues 5 and 7, 140 N.C. 540, 544; Revisal, 591; Pittman v. Kimberly, 92 N.C. 562, and numerous cases thereto cited in the Anno. Ed., and Burrell v. Hughes, 120 N.C. 277, citing numerous cases and with numerous annotations in the Anno. Ed. It appears in the record that the solicitor agreed with the prisoner's counsel that the case might be postponed and docketed at this term. This was an irregularity, and was beyond his authority. The statute must be complied with and the cause docketed at the next term here after the trial below. If in any case there is any reason why this cannot be done, (371) the appellant must docket the record proper and apply for a certiorari, which this Court may allow, unless it dismisses the appeal, and may then set the case for trial at a later day at that term or continue it, as it finds proper. It is not permitted for counsel in a civil case, nor to the solicitor in a State case, to assume the functions of this Court and allow a cause to be docketed at a later term than that to which the appeal is required to be brought by the statute and the rules of this Court.
No error.
Cited: S. v. Ratliff, 170 N.C. 709; McNeill v. R. R., 173 N.C. 731; S.v. Neville, 175 N.C. 736; Mimms v. R. R., 183 N.C. 437; S. v. Farmer, 188 N.C. 244, 245; S. v. Hartsfield, 188 N.C. 358; Stone v. Ledbetter, 191 N.C. 778; S. v. Jackson, 199 N.C. 326; Pruitt v. Wood, 199 N.C. 790;S. v. Casey, 201 N.C. 623; S. v. Moore, 210 N.C. 461, 462; S. v. Moore,210 N.C. 688.