## STATE v. EARL NEVILLE.

(Filed 21 February, 1918.)

**1. Constitutional Law—Criminal Law—Evidence—Identification.**

Testimony that defendant was placed for identification in the same relative position to a witness as the perpetrator was seen by her just before committing a criminal offense is not objectionable as forcing the defendant to give evidence against himself in denial of his constitutional rights; and the fact that the witness was not so certain of the identity on the day the crime was committed goes only to her credibility, which is for the determination of the jury.

**2. Evidence—Impressions.**

· Where relevant testimony has been introduced by the State that the prisoner's hat and cap had been found in witness's kitchen, which would require the unlatching and opening of the door, it is incompetent for the prisoner to ask the witness, not an expert, if she thought she would have heard any one there, as such would be only the impression of the witness and not the statement of a fact.

**3. Evidence—Character—Witnesses.**

Where a character witness for a witness for prisoner has stated that he had not heard any one say anything about the character of the witness, the exclusion of a question as to whether he had heard his character discussed is not erroneous or to prisoner's prejudice, the witness afterwards testifying as to good character.

**4. Evidence—Character—Witnesses—Specific Statements—Cross-Examination.**

Proof of character of a witness must be elicited by general questions, and not by specific statements of the witness as to what another person has said respecting it; and a party may not ordinarily cross-examine his own witness upon the subject.

**5. Criminal Law—Evidence—Corroboration—Appeal and Error—Harmless Error.**

Testimony of the husband of the prosecutrix in a criminal action that he told the officer, "I believe you have got the right man": *Held,* competent as corroborative in this case and harmless in any view of it.

**6. Instructions—Contentions—Appeal and Error—Objections and Exceptions—Harmless Error.**

Where upon trial of a criminal action the judge has properly charged the jury on the presumption of prisoner's innocence and the burden of proof required of the State, his statement, if erroneous, of defendant's contention, not properly objected to, that the question of prisoner's identification arose from a mistake of the prosecutrix and not from false testimony, is not reversible error.

BROWN, J., concurring; WALKER, HOKE, and ALLEN, JJ., concurring therein.

APPEAL by prisoner from *Connor, J.,* at October Special Term, 1917, of WAKE.

STATE *v.* NEVILLE.

The prisoner was convicted on an indictment for rape and upon the sentence of death being imposed, appealed.

*Attorney-General Manning and Assistant Attorney-General Sykes for the State.*

*W. B. Jones and A. T. Shaw for prisoner.*

CLARK, C. J. The prisoner was charged and convicted of rape committed upon Mrs. Sybil Sealey at her residence in the suburbs of the city of Raleigh on the night of 19 September, 1917. She testified that she was alone with her three young children about 11 o'clock at night, her husband not being at home. It is unnecessary to narrate the details further than to point the exceptions of law which are presented for our consideration.

The counsel for the prisoner, in the argument here, presented with ability and forcefully the objections urged in behalf of their client. But after giving full consideration to their argument, we are convinced that the prisoner has had a fair trial and that there is no just ground for exception.

The exception chiefly pressed is that the prisoner was taken to the home of the woman assaulted the day following the crime and placed in a position at the window which corresponded to the position in which the party committing the crime, according to the testimony of Mrs. Sealy, was standing just prior to the commission of the crime. And in that position he was identified by her. The argument for the prisoner is that being placed in such position he was forced to furnish evidence against himself in violation of his constitutional rights and privileges. This proposition, however, has been repeatedly decided against such contention in this and other Courts. *S. v. Holt,* 218 U. S., 245.

It was no more a violation of the constitutional rights of the prisoner to present him to Mrs. Sealey for identification in the place where the perpetrator stood than to make him stand up in court for the same purpose. Indeed, it was fairer to him to present him to her amid the surroundings where the occurrence took place. Moreover, unless she identified him there was no ground to hold him in jail. The correctness of her identification was a matter for the jury.

In *S. v. Graham,* 74 N. C., 646, *Judge Rodman,* for the Court, said: "The first exception is because the judge permitted the officer who had the prisoner in custody to testify that he made the prisoner put his foot in the tracks found in the prosecutor's field, and that his foot fitted the tracks perfectly. It is argued that to make the prisoner put his foot in the track was procuring evidence by duress, and the case of

*S. v. Jacobs,* 50 N. C., 259, is cited. The object of all evidence is to elicit the truth. Confessions which are not voluntary, but are made either under the fear of punishment if they are not made, or in the hope of escaping punishment if they are made, are not received as evidence, because experience shows that they are liable to influence by those motives and cannot be relied on as guides to the truth. But this objection will not apply to evidence of the sort before us. No fears or hopes of the prisoner could produce the resemblance of his track to that found in the cornfield. This resemblance was a fact calculated to aid the jury and for their consideration.

"Evidence of this sort is called by the civilians 'real evidence,' is always admissible, and is of greater or less value according to the circumstances. In Best on Evidence, sec. 183, the following instances of its value are given: 'In a case of burglary, where the thief gained admittance into the house by opening the window with a pen-knife, which was broken in the attempt, and a part of the blade left sticking in the window frame, a broken knife, the fragment of which corresponded with that in the frame, was found in the pocket of the prisoner. So, where a man was found killed by a pistol, the wadding in the wound consisted of a part of a printed paper, the corresponding part of which was found in the pocket of the prisoner. In another case of murder, a patch on one knee of the prisoner's breeches corresponded with an impression found on the soil close to the place where the murdered body lay. In a case of robbery the prosecutor, when attacked, struck the robber on the face with a key, and a mark of a key with corresponding wards was visible on the face of the prisoner, etc. Similar instances might be cited indefinitely. The exception, however, is that the officer made the prisoner put his foot in the track in order to test the resemblance. It has been seen that this could not alter the fact of the resemblance, which is the only matter that would have weight in evidence."

In *S. v. Thompson,* 161 N. C., 238, the following testimony was found to be admissible: "Clifford Fowler, witness for the State, testified in regard to the tracks found outside the window and to following them to the house of the prisoner. He stated that when the coroner's jury was at the house of the deceased, the prisoner went to the house with his gun and was put in the tracks, and that the prisoner was of sufficient height to have fired the gun. He was then asked, 'Tell how the prisoner acted in taking these measurements,' to which witness answered: 'I like not to have got him up there. He didn't want to go there at all.'

"Q. What did he do? A. Some one handed me a gun. I took him around to the window and handed him the gun. I said, 'Sam, get up

there; I want to see if you are high enough to do the shooting.' I said, 'You must take the gun.' He did, and stepped up and put the gun over his shoulder. I said, 'Put it to the shoulder just like you were going to shoot it.' He fetched the gun up and did like this (witness crouches down). He put his feet within 3 or 4 inches of the track. I said, 'Measure it and put your gun up there.' The gun looked like it might have been that distance, about 7 inches from the window.

"Q. State to the jury, after he put it on his shoulder and pointed, if you got behind and sighted to see where it sighted with reference to where deceased was sitting. A. It was on a line, and the shot was on the line.

"The testimony of the constable giving the result of the observation of the prisoner standing at the window and pointing his gun in the direction in which it is known that the deceased was at the time he was shot, is a physical fact or condition as to which he could testify as in the case of the comparison of shoes and footprints. Wigmore on Ev., secs. 2263, 2265."

*S. v. Graham, supra,* was approved in *S. v. Mallett,* 125 N. C., 725, which on writ of error was approved by the United States Supreme Court in 181 U. S., 589, which United States decision is printed in 128 N. C., 619. The above and other cases are cited with approval in *S. v. Lowry,* 170 N. C., 733, 734.

Exception on this ground was not taken of the trial, but in our discretion we have permitted it to be entered here and argued.

The prisoner's counsel also urged that when the prisoner was presented to Mrs. Sealey the same night the crime was committed, she was not so positive of his identity, but the next day, a crowd being present, she identified him fully. This was a matter for the jury and was doubtless fully argued before them by his able counsel. The fact that when presented to her the first time she was not so clear as to the identity of the prisoner certainly is not a matter of which the prisoner can complain. It was to his interest and not to his harm that this matter was brought out. What she said on both occasions was competent to corroborate or contradict her testimony of identification of the prisoner at the trial.

Zilphia Jones, the witness for the prisoner, at whose house they found the hat or cap alleged to be worn by the prisoner at the time the crime was committed, testified regarding the premises where she lived and stated that "nobody could have gotten in at the kitchen unless they had unlatched the door and pushed it open." The counsel for prisoner then proposed to ask this question: "Do you *think* you would have heard anybody there?" The court sustained the objection by the State and excluded the question. The witness had not qualified as an

expert, and there was no ground to except her from the general rule that witness may testify only to facts. *S. v. McLaughlin,* 126 N. C., 1080. She was not expressing an impression created on her mind as to what she saw (*S. v. McDowell,* 129 N. C., 524), but was asked simply an abstract question as to what she thought as to the extent to which sound could be heard at that place. Besides there is not set out what answer the witness would have given nor its relevancy. *S. v. Rhyne,* 109 N. C., 794. This and several other exceptions are abandoned by being omitted in the brief. Rule 34, 164 N. C.

Exception 2 is that a witness on being asked as to the character of Olivia Baucom, a witness for the prisoner, stated that he had never heard any one say anything about her character. Counsel then asked, "You never heard her character discussed?" The Court excluded this question, but the witness being further questioned stated that "Her character was good."

The court also properly excluded a question by prisoner to same witness as to character of Olivia Baucom: "What did you hear your sister say about her?" Proof of character must be elicited by general questions, but not by specific statements. *S. v. Hairston,* 121 N. C., 579. Nor can a party thus cross-examine his own witness. The other exceptions down to 8 require no discussion and were doubtless taken out of "abundant caution."

Exception 8 is that the witness Sealey (the husband) testified that he had said to Captain Brown of the police, "I believe you have got the right man." This was in corroboration of his testimony and in any view was harmless. Few of the other exceptions require any discussion for the case turned upon the testimony of the woman as to whether the crime was committed, and if so as to the identity of the prisoner. These were matters eminently for the jury.

The court, in stating the contentions of defendant's counsel, said that he did "not understand that it is contended that Mrs. Sealey has knowingly and intentionally testified falsely as to the identification, but that she is mistaken. The defendant contends that upon all the evidence Mrs. Sealey is greatly interested, and naturally so, about this unfortunate episode," etc. If the court erred in saying this, counsel should have asked him to state their contention correctly (*S. v. Fogleman,* 164 N. C., 458), nor can we consider the exception now taken to the charge as to matters in regard to which the court was not asked to charge.

The entire charge shows a careful regard for the rights of the prisoner and reiterates at its close the following which had been previously stated in effect in the course of the charge:

"In passing upon this evidence, I instruct you that you ought to give full force and effect to the great principle which prevails in our criminal procedure that any and every man charged with crime is presumed to be innocent, that is, from the very moment he is put on trial and up until you render your verdict, he is presumed to be innocent. The protection with which the law thus surrounds him can not be taken away from him until the State has satisfied you, thoroughly by evidence, beyond a reasonable doubt, of all the facts necessary to be found by the jury in order to establish the guilt of the defendant. Now, gentlemen, counsel have argued to you, and argued to you correctly, that the law is that unless you are satisfied beyond a reasonable doubt of the guilt of this defendant, that you ought to return a verdict of not guilty."

After full consideration of all the exceptions, the Court finds no error. There was strong evidence of corroborating facts.

And now, speaking for myself only, and not for the Court: In *S. v. Trull*, 169 N. C., 370, we called attention to the fact that the appeal ought to have been docketed at the preceding term, and that the consent to the extension of time by the solicitor "was an irregularity and was beyond his authority." In this case, if the statute had been complied with, this appeal would have been docketed in time to have been heard at the "end of the docket" at last term. Rule VI, 164 N. C., 432 (Anno. Ed.).

Revisal, 591, requires that the statement of the case on appeal should be "served on the solicitor within 15 days," who shall return the case with his exceptions, if any, "within 10 days," and that the appellant "shall immediately request the judge to fix the time and place for settling the case, 'who shall' forthwith notify the attorneys, which time shall be not more than 20 days from the receipt of such request, and that at that time and place the judge shall settle and sign the case and file a copy in the office of the clerk, who shall within 20 days transmit the transcript to the Supreme Court." The special term began 8 October. The sentence and appeal were entered 13 October. With reasonable diligence, the case could have been docketed at last term in time to have been heard and disposed of at the call of the end of the docket, even if the entry "by consent 30 days to serve case and 30 days to serve counter case" had been valid.

But we have repeatedly held that the time fixed by the statute cannot be extended by the judge (*Cozart v. Assurance Co.,* 142 N. C., 522, and cases cited; *Gupton v. Sledge,* 161 N. C., 213), and we intimated very plainly that it is not advisable that it should be done by counsel in civil cases and that the solicitor is without authority to extend the time any more than the judge could. *S. v. Trull, supra.*

It is in the interest of justice that criminal actions especially should be disposed of promptly. Speedy disposal of cases is recognized in Magna Carta as a right of the defendant. It is no less the right of the State in all criminal proceedings. If delay is necessary for a defendant to procure a fair trial before the jury, that is a matter vested in the discretion of the trial judge for which he bears the responsibility if the delay is unnecessarily granted. But there can be no reason why after the trial there should be delay in settling and transmitting the case on appeal beyond the time allowed by law except the convenience of counsel, which cannot avail against the express and clear intent of the law.

On this occasion the prisoner, a negro, was charged and imprisoned for rape upon a respectable white woman in her little residence on the edge of Raleigh, where she was alone with her three little children. The Governor of the State was called out of his bed at midnight to face a crowd of men who were assaulting the jail in Raleigh to take the prisoner out and execute him summarily. Their motive was because they feared that by the dilatoriness of justice, if not its uncertainty, the preventive and needed protection of prompt and certain punishment against such crimes would be lost. The Governor thought such was their motive, for he pledged those men that "a special term would be at once called, the man promptly tried and if found guilty beyond a reasonable doubt by a jury of 12 men, he should be promptly executed." The Governor kept his word. A special term was at once called in the shortest time allowed by law. A judge from another district was sent here to hold the term. Grand jurors and jurors were called here at great inconvenience to themselves and the expense of the term was incurred to redeem the Governor's pledge. The writer has not investigated nor does he seek to apportion or place the blame, but it is certain that the pledge was frustrated and the object of the extra term not attained. If the law in regard to time in settling the case had been observed, it would have been docketed and disposed of before Court adjourned on 23 December. The trial began 8 October, and the appeal was taken 13 October. Two months and eleven days elapsed between those dates—which was ample time if the statute had been complied with in which to settle and send up the case on appeal.

Courts are not above public criticism. Their officials are servants and agents of the people, and like the Centurion, they are "under authority and the law," and not above it. The writer, like any other citizen, has a right to notice, and as Chief Justice of this Court it is his duty to call attention to any defects or inefficiency in the administration of justice. The object is not to censure any official but, as in *Trull's case,* to prevent repetition of prejudicial delays in the courts.

47—175

The Constitution prescribes that the Supreme Court has supervisory power and control over the inferior courts, which makes this Court to a certain extent responsible if such defects as are brought to our attention are passed by unnoticed and therefore with our *quasi*-approval.

Of what avail will any promise on such occasions be hereafter when the pledge of the Governor of the State, made in the Capital City, has thus amounted to nothing except useless expense to the public and added compensation to officials for the extra term? Such offenders need never fear speedy punishment and lonely women will have no protection from the brute's fear thereof. In view of such consequences, this matter should not pass unnoticed. There is no desire to criticize any one official, for they must adjust the responsibility among themselves, but to condemn the fact.

In *S. v. Cameron,* 166 N. C., 385-7, I called attention to the fact that the administration of justice in this State was dilatory and inefficient as regards capital offenses, with the result that in some years we had had twice as many criminals executed by lynch law as by the courts, and that we had annually according to the Attorney-General's reports, twenty times as many capital cases in this State in proportion to population as in London with its heterogenous population from all quarters of the globe, and that our percentage of homicides is greater even than in Sicily, notwithstanding its "Blackhand" and "Mafia." I exonerated then, as I do now, my associates from any responsibility for thus discharging what I believed my duty. The facts I there stated are not denied. Since then throughout the country the State and American Bar Associations and many judges and law writers have felt the necessity of giving ear to the growing dissatisfaction with the courts and of discarding the technicalities and unnecessary delays which have brought them under criticism.

There has been some slight betterment in the trial of capital cases in this State by some reduction in the enormous disproportion of peremptory challenges which has always made it impossible with us to convict any man of a capital offense if possessed of influence and of means to retain influential counsel.

The defect in this case has been in the usual "senatorial courtesy" which puts the convenience of counsel and officials above duty to the public. In this case, unlike the *Trull case,* there was notice to the public, and especially to the court officials that the Governor, by calling a special term, deemed that the public interests required prompt action and that if found guilty the prisoner should be promptly executed, which of course called for prompt review on appeal of any exceptions of law taken at the trial.

Nothing is more destructive of the social order than lynching; noth-

ing that is more completely anarchy than this taking human life, not by authority of law. When the Emperor Galba was told by one of his adherents that he had slain the leader of an insurrection against him, the stern Roman asked, "Who ordered you?" The prevalence of lynching in this State has been known to all men, outside of our borders as well as within, yet there are those who think it should not be mentioned by the courts because (in their opinion) it is little short of sacrilege to admit the inefficiency of officialdom which is responsible for it.

Nothing can prevent some crime occurring, but promptness and certainty of punishment can reduce it to a minimum. As long as human nature is what it is, whenever men see that their courts do not repress crime by promptness and certainty of punishment, or believe that the pardoning power is overexercised, they will, on occasion of sufficient importance, take the law in their own hands, to secure the protection which the courts ought to give them.

This brutal crime was committed on 19 September, 1917, now more than five months ago, and the man whom the jury have found committed the crime is still unpunished. The certificate of this opinion will not go down in regular course till the first Monday in March. The Governor, according to custom, may assign 30 days before execution, which will take place, therefore, after nearly seven months delay. By the combined power of an illegal mob and the Governor a trial was had within a reasonable time, but this has had no effect on the dilatoriness of the courts. There was no haste in the trial, and this Court has found no error was committed in its conduct. But an execution delayed for seven months does not produce the deterrent effect of promptness in the punishment of the guilty.

The victim of this brutal crime was not the wife of a banker, a lawyer, or a rich man, with attendants around her to prevent the possibility of its occurrence. She, like many thousands of good women throughout the State, was left alone with her little children during her husband's absence at his work. They need the protection of the terror of a prompt and speedy execution of the law. And that should not be withheld for the convenience of counsel or by the easy indifference of officials.

As a Legislature is to be elected this year, it is a matter for their consideration whether regulations shall not be prescribed for the more prompt sending up of appeals in criminal cases, and this Court might prescribe regulations for the more immediate sending down the certificate in cases of this kind, for the protection of the women of the State, and indeed in all capital cases. So necessary is promptness as a deterrent of crime that in England an act of Parliament requires that

the appeal in every criminal case must be docketed within ten days after trial, and ordinarily the court renders its decision in less than 20 days and in murder cases usually in much shorter time. Even in Germany the law requires that the argument on appeal in criminal cases must be had in the higher court within a fortnight after the verdict and the opinion is always promptly delivered.

Besides the solicitor was not required to take the full time allowed him to serve his counter-case of 10 days, nor was the judge required to take 20 days to set a time to settle the case on appeal, nor was the clerk required to take 20 days in which to transmit the transcript to the Supreme Court. *These were the limits.* The clerk cannot withhold and presumably did not hold the case back for prepayment of his costs. *S. v. Nash,* 109 N. C., 822. If the case gets up to the Supreme Court by economy of the time allowed, it would have been heard at that term. This is fully discussed in *Caldwell v. Wilson,* 121 N. C., 424. The appellant had no power to prevent its being docketed for "An appeal is deemed docketed when the transcript is received by the Clerk of this Court. It then becomes a record of the Court, not subject to control of parties or counsel." *Brafford v. Reed,* 124 N. C., 345.

During the unnecessary delay of this case, on 12 January, 1918, in this county, another rape upon a white woman by a negro was committed. It is probable that if there had been prompt action in regard to this case the subsequent crime would not have been committed. If punishment does not deter from crime, why impose a capital sentence at all?

Crimes of a capital nature are always committed under some powerful influence, and the occurrence of lynch law proves that the judgment of the common sense of the people is that the terror of prompt investigation and punishment of the guilty is necessary as a deterrent. We must either accept lynchings as a permanent evil or prevent it, like other countries, by making the courts prompt and efficient in the punishment of crime.

To prevent any possible criticism attaching to my brethren, I repeat, in the language of the great Apostle to the Gentiles, that "These things I say for myself, and not by commandment."

For the Court let it be entered that after a careful review of all the exceptions of the prisoner, we find

No error.

BROWN, J., concurring: I concur in the opinion of the Court rendered by the *Chief Justice* upon the matters of law presented upon the record, and am clearly of opinion that no error was committed upon the trial in the Superior Court that justifies us in directing another trial.

With entire deference for the opinion of others, I do not think that the record discloses that there has been any unjustifiable delay in docketing the appeal in this Court or that the learned judge of the Superior Court who presided at this trial, or the diligent and able solicitor for the State have been guilty of any negligence or dereliction of duty whatever.

As the case was tried last October, under our statute the appeal was properly taken to the succeeding term of the Supreme Court, which is the present term. By consent of counsel for the prisoner, it was advanced and argued five weeks in advance of the regular call of the Seventh District.

The solicitor could not compel the prisoner's counsel to docket the appeal until the present term, and this Court could not properly issue a writ to compel such docketing in advance of the date fixed by law.

If, however, the appeal had been docketed here at last term, it could have been then heard, but there is no law compelling such advanced docketing that I am aware of.

I am further of opinion that the solicitor has the right to consent to the enlargement of time within which to serve a case on appeal. I do not understand that *Trull's case* decides to the contrary. It holds that the solicitor has no right to consent to a postponement of the docketing of an appeal in the Supreme Court beyond the time fixed by law.

Formerly the statement of the case on appeal in criminal actions was prepared by the judge (*S. v. Randall,* 88 N. C., 611), but it is now provided by statute (Revisal, sec. 3277) that "the appeal shall be perfected and the case for the Supreme Court settled as provided in civil actions."

This change in the law makes it necessary to serve the case on appeal on the solicitor personally, as "the solicitor represents the State in criminal prosecutions and the statement of cases on appeal in such cases should be submitted to him for acceptance or objection." *S. v. Cameron,* 121 N. C., 572.

The solicitor may agree to a case on appeal detrimental to the cause of the State, and the judge cannot correct it, as held in *S. v. Chaffin,* 125 N. C., 664, in which *Clark, J.,* says: "The case on appeal was agreed upon by the solicitor and the counsel for the defendant. Such being the case, there is no ground for action by the judge (*S. v. Cameron,* 121 N. C., 572; The Code, sec. 1234), nor for a *certiorari* to correct the case by the judge's notes of the evidence on file; nor to permit the judge to correct the case."

With such absolute control over the statement of the case on appeal, it would be very remarkable if the law denied to the solicitor the right

to agree to an enlargement of the time when necessary to properly make up such case. He has the same power as counsel in civil cases, and their right to agree to such extension of time has never been questioned. Pell's Rev., sec. 591, and cases cited.

Why then question the right of the solicitor? It is derived from the same statute.

The existence of the power is necessary to protect the interests of society and of the State, as the solicitor cannot expect an extension of time if he cannot grant it, and if the solicitor is always held to ten days within which to serve his counter-case, the case of the defendant may be served on him at the beginning of a busy term when he could not give it attention during the ten days without neglecting other duties.

Again, there has been no delay. The appeal is here as soon as it would have been if no provision of the statute had been waived, and no extension of time granted. The prisoner was sentenced to death on 13 October, 1917; the papers for settlement of case on appeal reached the judge on 8 December, 1917, and the case was settled on 18 December, 1917, showing a period of 67 days from the time the appeal was taken until the case was settled.

Under Revisal, sec. 591, the defendant had 15 days within which to serve his case; the solicitor 10 days to serve counter-case; the defendant 15 days to send the papers to the judge; the judge 20 days within which to fix its time for settling a case. The clerk of the Superior Court is allowed 20 days within which to transmit the transcript to this Court (Revisal, 592), making a total of 80 days given by the State within which to docket case here. This would have brought the record to this Court on 2 January, 1918, some 10 days after its adjournment at Fall Term, 1917.

It cannot be justly charged that public officials are derelict in their duty when their acts are well within the statute enacted for their direction.

I know from long experience on the Superior Court bench something of the exacting nature of the duties of that office and how little time judges and solicitors have to make up cases on appeal, a very difficult and tedious character of work. In this case I think the judge and the solicitor acted well within the authority conferred on them by law, and I know they acted conscientiously and with a desire to serve the best interests of the State.

They, too, have been elected by the people, to whom they are responsible, not to this Court, and our supervisory jurisdiction over other courts is restricted by the Constitution (Art 4, sec. 8) to the issuing of remedial writs for which no application has been made, and does

not extend to the right to condemn public officers without notice and when they have not been heard and cannot defend themselves.

That our Superior Court judges and solicitors do their full duty is shown by the records of our courts and the manner in which business is dispatched in them. There is no unreasonable delay in the trial of criminal cases in North Carolina. On the contrary, there are few, if any, States in the Union where they are more rapidly disposed of.

I am authorized to state that Justices WALKER, HOKE, and ALLEN concur in this opinion.