BEATRICE COOK v. HIGHLAND HOSPITAL AND ROBERT S. CARROLL.

(Filed 24 February, 1915.)

1. **False Imprisonment—Asylums—Insane Persons—Inducements—Contracts —Rules of Institution—Damages.**

Where under inducement that a hospital is a private sanitarium for the nervous sick, which furnishes to its patrons, for hire, luxurious accommodations and elegant diet, baths, etc., a patron admittedly sane signs a contract to abide by and be subject to its rules, unaware and without notice that the institution was in fact a private asylum for the insane, the agreement cannot give the institution the right to detain her against her will in a scantily furnished room on meager diet, and to coerce her into submission by placing her in a padded cell near those of shrieking maniacs, subject her to rough treatment, and to cut her off from communication with her family; and such detention being unlawful, actual damages are recoverable.

2. **False Imprisonment—Good Faith—Punitive Damages.**

As to whether the question of good faith will be a defense to a recovery of punitive damages for unlawful detention or imprisonment, *quære.*

3. **False Imprisonment—Insane Asylums—Rules—Infringement—Duty of Authorities.**

Where one has been induced to enter into a private insane asylum for hire, while sane, not knowing its character, and has signed an agreement to submit to its rules, the recourse of the authorities of the institution is

to discharge her for infringement of the rules, and not forcibly detain and coerce her into submission; and should she, while confined, become too dangerous to be set at large, it becomes the duty of the authorities to notify her relatives.

4. **Appeal and Error—Damages.**
    Where the jury have assessed the plaintiff's actual damages for being unlawfully detained in a private insane asylum by its authorities, and the amount has been approved by the trial judge, it is not reviewable on appeal.

5. **Appeal and Error—Jurors—Misconduct—Findings of Fact.**
    The findings of fact by the trial judge in this case as to the alleged misconduct of a juror is not reviewable. *Lewis v. Fountain, post,* 277.

APPEAL by defendant from *Cline, J.,* August Term, 1914, of BUN-COMBE.

This was an action to recover damages on account of the unlawful detention of the plaintiff by the defendants in the defendant hospital operated by the defendant Carroll, and for assaults committed on her and neglect of her while in the hospital, which acts are alleged to have been wrongful and committed willfully, wantonly, and maliciously by the defendants.

The defendants denied that any wrongful acts were committed by them; as alleged by the plaintiff, but aver that she regularly entered herself as a patient and agreed to be governed by the rules and regulations of the hospital; that she was nervous and not capable mentally of caring for herself, and that what was done was in accordance with the rules and regulations of the institution, and denied that she was assaulted or neglected while under their care.

The jury found for their verdict that the defendants wrongfully imprisoned the plaintiff and restrained her of her liberty, as alleged in the complaint, and that this was done wantonly, willfully, and maliciously by the defendants, who also wantonly, willfully, and maliciously assaulted her, as alleged in the complaint, and awarded compensatory damages, but no punitive damages. The defendants moved to set aside the verdict upon the ground of misconduct by a juror, but the court found upon the evidence that there was no misconduct as alleged, and denied the motion and entered judgment for plaintiff upon the verdict. Appeal by defendants.

*Jones & Williams and Oliver & Oliver (of Savannah, Ga.) for plaintiff.*

*Martin, Rollins & Wright for defendants.*

CLARK, C. J. The plaintiff was a young woman, about to be married, who came to Asheville, N. C., from Savannah, Ga., to rid her system of,

malaria and for recreation and rest. She was somewhat delicate and nervous, but the evidence is that her mind was perfectly clear. Having heard of the Highland Hospital, operated by Dr. Carroll, as a sanitarium, she entered that institution after visiting it, but it was concealed from her that it was in effect a private asylum. The defendant Carroll gave her two pamphlets, one entitled "Diets," describing most delicious and appetizing foods. The other contained a description of sixty different "baths," most elegant and luxurious, and offering most enticing inducements to patients. These pamphlets filed in the record are the *ne plus ultra* of all that is elegant and luxurious in bathing and diets.

According to the evidence of the plaintiff and her sister she entered the institution upon these representations and with no other thought than that she would be free to leave at will, could communicate freely with her family, and would receive the baths and diet mentioned in the pamphlets. She contracted for and received a front corner room, and her married sister returned to the hotel. This was on Sunday, 4 August, 1912. On the next day she was informed that she would not be permitted to see her married sister nor communicate with her, and was told that she must have her breasts massaged and her hair shampooed. She testified that her hair had been shampooed just before leaving home and she was suffering from cold, sore throat, and earache, and that her physical condition just at that time forbade her being subjected to being massaged, and she protested against both. The nurses gave this information to the defendant Carroll, but he gave imperative orders that the plaintiff "must be massaged and shampooed." Her evidence is that in obedience to this order two or three nurses took the plaintiff forcibly from her bed, while lightly clad, raised her forcibly from the floor, when she fell upon it, carried her to the bathroom, massaged her breasts and shampooed her hair against her will. The plaintiff then demanded to leave the hospital, and to see her sister, and announced that she would not remain. The defendant Carroll was informed of this. He thereupon gave orders that the plaintiff was not to see her sister or leave the hospital. According to the defendant's testimony, the plaintiff stated that she would jump out of the window before she would stay there without seeing her sister. The defendant Carroll thereupon directed that she should be moved into a protected room or padded cell located in the rear, with diamond-shaped wire meshing on the inside and iron bars on the outside, a locked door, and an electric light at the ceiling inclosed with wire and operated from the outside. This room had scant furniture and, according to the report of the nurses, was infested with roaches.

Adjoining this locked cell were raving. lunatics shrieking to be let out. On each of the days prior to this time and after the plaintiff was taken to the barred and locked cell the plaintiff's married sister paid visits to

the hospital, but was kept in ignorance of the treatment given to the plaintiff and was not permitted to see her. The plaintiff was kept immured in the cell, above described, adjoining raving insane people, while her married sister returned to Savannah, carrying assurance from the defendant Carroll to the family that the plaintiff was progressing nicely.

After five days the plaintiff was removed from the locked and barred cell to another back room, where she was restrained of her liberty against her will and prevented from communicating with any member of her family for more than three weeks, making thirty-two days in all, until her mother, after receiving a pathetic letter written by the plaintiff, who had bribed a colored maid to secure a pencil and mail a letter, came to the sanitarium and demanded her daughter.

The "Highland Hospital" was incorporated, but the defendant Robert S. Carroll was in sole and exclusive charge, and, together with his wife, owned ninety-nine shares out of the one hundred shares of the capital stock. During the entire time the plaintiff was in the hospital the defendant Carroll visited her only three times, according to the plaintiff's testimony, or five times according to the defendant's testimony. The plaintiff was paying $35 per week for board and was charged $15 per week extra for half the time of a trained nurse who was only a student and who was being paid only $8 per month by the defendants. The plaintiff was subjected to compulsory hypodermic injections twice every day during her stay, against her protest. Her breasts were forcibly massaged each day in such a forcible manner that she groaned under the treatment.

Instead of the luxurious diet described in the pamphlet, the food given the plaintiff was 3 ounces of milk and 1 ounce of lithia water eight times a day at the beginning, which was increased to 6 ounces of milk, 1½ ounces of cream, and two raw crated eggs. She was read "Why Worry" and "Those Nerves" constantly during her stay. The defendant Carroll wrote only one letter to her family during the thirty-two days she was immured under his control. The plaintiff's arm was injured by the force used in dragging her to the bathroom to such an extent that she complained of it constantly during her stay in the hospital. She testified that she was such a physical wreck by reason of her treatment that she could not make her wedding clothes after her return home, and that she could not hold her baby after it was born. She graphically describes her agony of mind during her illegal restraint among lunatics, in a private asylum, in a distant State, far from home and friends, without means of communication with her family, without money and clothes with which to escape, being forcibly detained against her will and having entered the institution, according to her testimony, without knowledge

of its nature and being duped into supposing that it was a rest cure, with luxurious diet and baths. She testifies that she returned home a nervous wreck, requiring careful treatment for many months and indelibly stamped with her experience as a prisoner in a madhouse.

The defendants in their evidence deny the mistreatment, allege that the plaintiff was nervous and hysterical, but admit that she was restrained of her liberty; that she was placed in the "protected" room and afterwards removed to another "protected" room; that her hair was shampooed, though she earnestly resisted, and that she was restrained of her liberty and kept in the institution against her will, and that the family were not informed of that fact. The defendant Carroll testified that he restrained her and kept her in the institution against her will; that her lack of self-control had reached hysteria, which was that she was "impulsive and would do unreasonable things." He did not testify that she was insane, but said that hysteria is "the borderland between sanity and insanity."

The judge properly told the jury, "If the plaintiff was 24 years of age, unmarried, and was there in the hospital, and she subsequently applied to the authorities of the hospital for, and demanded, her release—demanded that she be allowed to go from the institution and be allowed and suffered to leave there, and after such demand made, if you find it, and that it was communicated by the nurses, or through the proper channels, to Dr. Carroll, and after that, that she, either by words or by locking doors or by anything that comes up to the definition of imprisonment that I have given you, was imprisoned, so that she was unable to carry out her desires and wishes in that regard, then if you find these facts, after that, the court charges you as a matter of law that she would be wrongfully imprisoned and restrained of her liberty.

"If you were to find that she was in the institution and that she was demanding to be released, which was properly communicated to the hospital authorities, but if you were to further find to your satisfaction that she was so nervous from any ailment or disease and so irrational that there was reasonable probability that if so released at the time she would do herself some bodily harm, under such circumstances the hospital would have the right to detain her, and restrain her, under the law of necessity and humanity, until that condition as to the reasonable apprehension of doing herself bodily harm had passed. And within that rule or limitation it would not be a wrongful and unlawful imprisonment.

"Now, it is for you, gentlemen, to say from the testimony, the facts you find, how this matter is. Even though she went in under this paper, and if you find, as she contends, that she was perfectly rational and knew what she was doing, what she wanted and didn't want, and she wanted to leave the institution, and expressed it to the hospital authori-

ties, and the hospital authorities knew of that fact, and then after that restrained her of her liberty, then it would be in law, as I am holding, wrongful detention, unless they were justified in restraining her under those rules of humanity and regard for her welfare, as I have just given you."

There was a conflict of evidence as to the treatment that the plaintiff received, but there is no controversy that the plaintiff was detained in the defendant's hospital against her will; confined for thirty-two days; that she was confined a considerable part of the time in a locked and barred cell; that she was denied all communication with her friends and subjected to having her hair shampooed and to massage of delicate portions of her body and to hypodermic injections daily against her will.

The defendants contend that they had a right to do these things because the plaintiff signed an agreement upon her entrance that she would be subject to the rules and regulations of the institution, and that she could not be set at liberty without danger to herself. The judge submitted this latter phase to the jury, who found against it. Besides, the defendants did not account for the fact that though the plaintiff's sister visited the institution, they gave her no information as to plaintiff's condition and treatment, and that during the whole thirty-two days that the plaintiff was restrained by them of her liberty and subjected to physical treatment against her protest no information was given by the institution to her relatives, though this was practicable during the entire time by wire or long-distance phone.

The judge properly told the jury that the plaintiff could not thus surrender control of herself to another by signing a paper at her entrance into the institution. 4 Cyc., 365; *In re Lambert,* 55 L. R. A., 856; *In re Baker,* 29 How. (Pr.), 488. The main defense relied upon by the defendants is that if they acted in good faith there would be no liability upon their part. Whether or not this would be a defense to a recovery of punitive damages we need not discuss, for the jury in their verdict denied the plaintiff, on the issue submitted for that purpose, any recovery of punitive damages.

"Good faith" is not a defense to the recovery of compensatory damages when the jury find that there was illegal restraint of liberty, and compulsory massage and hypodermic injections and other physical treatment upon a defenseless woman who was in the absolute power of the defendants and kept immured under lock and key and with barred windows, without information given by them to her family of her condition and she denied all communication with them.

It is unnecessary to discuss in detail the exceptions taken, for they are all covered by what we have said.

The plaintiff was not committed as insane, and if she had been the defendants do not account for the fact that they accepted her as sane by signing the agreement with her upon her entrance into the institution. If she subsequently became insane, it was the duty of the institution to have at once notified her·mother and sister. The testimony of the defendants, however, is that she was not insane. Evidently, the defendant Carroll believed that he had absolute control of the plaintiff and the right to imprison her if she opposed his orders or will, and the right to impose on her whatever treatment he thought best, and that the family need not be consulted any more than the plaintiff herself. The effect of being at the head of such institution is very often—too often—to render the person in charge callous and autocratic, and in his own opinion irresponsible to any one.

In this land the law guarantees liberty to every one, subject to restraint only in the modes provided by the law, and even then there is the right to review the conduct of those in charge of those deprived of their liberty. The plaintiff was not committed to the care of the defendants by any legal proceedings adjudging her insane, and her signing the paper agreeing to be subject to the rules and regulations of the institution was not irrevocable. It did not subject her to the irresponsible power and control of the defendant. This is the whole controversy, and requires no further discussion.

If the plaintiff did not abide by her agreement to obey the rules and regulations of the institution the remedy of the defendants was to discharge her or, if her condition forbade this, to notify her relatives (neither of which they did), and not to imprison her and to force her to do their will.

As to the amount of compensatory damages due the plaintiff by reason of her illegal detention, and the physical ill-treatment that she received, the jury have assessed the amount and it has been approved by the trial judge, and is not reviewable by us. *Norton v. R. R.,* 122 N. C., 937; *Benton v. R. R., ib.,* 1009, and citations; *Boney v. R. R.,* 145 N. C., 250.

The horrors of the imprisonment of a sane person in a private madhouse (and one is not the less such because it may be advertised as a "sanitarium") have never been more graphically related or probably more truthfully than by Charles Reade in "Hard Cash." Like the novels of Charles Dickens, it has aided to correct evils which till then oppressed and afflicted society without hindrance from those who administered the law.

The finding by the judge of the facts upon the motion for misconduct of the jury was based upon the evidence and is not reviewable by us, and his conclusion of law thereupon to refuse the motion was correct. *Lewis v. Fountain, post,* 277, and cases there cited.

No error.