STACY, J., dissenting.
This case was before the Court, 181 N.C. 215, where the facts are fully stated.
Bynum Tudor, son of the defendant George C. Tudor, at the time the plaintiff's intestate was killed in the automobile wreck, was something over 16 years of age, living with his father under his (341) care and custody. The father was the owner of two automobiles, kept on his premises, and which he permitted his son to drive at his pleasure, sometimes alone and at other times with the family. *Page 365 
On 19 June, 1918, at a dance for young people at the Country Club on the concrete road three miles west of Winston, Bynum Tudor invited Ruth Tyree, the plaintiff's intestate, a young girl something under 16 years of age, to go to the dance with him. It is admitted, and was in evidence, that he first asked his father for the large car (which was the Hudson touring car), but his father directed him to take the Buick Six roadster, which was a small car owned by his father. Just before going to the dance liquor was secured by George Tudor, an elder brother of Bynum, who was also a minor in the home of his father, which was placed in the Buick roadster. On the night prior to the dance a quart of liquor was in the office of the father, George C. Tudor, and his son, George C. Tudor, Jr., stated that it was for the dance. Drinks were given from this liquor to other young men before they went to the dance, and also after their arrival at the dance Bynum Tudor, who was handing the liquor around to the boys, and his brother put some of the liquor in the punch bowl prepared by chaperones for the young people to drink, and when, during the progress of the dance, Bynum Tudor was requested by one of his friends to walk across the floor he gave as an excuse that he was too dizzy.
It is also in evidence that just prior to going to the dance, and while the young men were assembling at the drug store, Bynum Tudor, who had purchased bottles to put the liquor in, hearing an automobile backing out of an alley, made the statement that "If they outrun me tonight, damn if they have not got to go some." After the liquor at his father's house had been secured and put in the automobile, and while the young people were assembling at the drug store, Bynum Tudor driving his car along the street saw one of the young men, to whom he called, "I have got it," and taking the young man down on a back street he gave him a drink from the liquor in the car. With the liquor stored away in the automobile, he called at the home of Miss Ruth Tyree and carried her from her father's home to the dance at the Country Club. Her remains, torn, bruised, and lifeless were brought back to this home the next day.
During the progress of the dance Bynum Tudor, who did not dance, was racing up and down the road extending from Winston to the Country Club at a speed estimated at from 50 to 60 miles an hour, sometimes racing other automobiles and sometimes motorcycles.
It is also in evidence that about a month prior to this time Bynum Tudor, driving this same car, was racing with two other cars along the road from the Country Club to Winston; that two weeks prior to this time he had been indicted in Greensboro for violation of the automobile law, and his father had compromised the indictment; that on Sunday, two days prior to this action, he again violated the (342) *Page 366 
automobile law by reckless driving on the street in Winston, and had been tried the following day in the police courts, and his father had paid the fine, and the very next night his father had permitted him to take the car with this young girl in it to the dance.
It is further in evidence that this dance lasted until about 1 a.m., and Bynum Tudor was one of the last to leave. In this Buick roadster, besides himself as chauffeur, was his older brother George, also a minor, and Miss Ruth Tyree. Another one of the young girls attending the dance testified that just before they started to leave for Winston she came to the car to speak to Ruth Tyree and found the fumes of liquor on him so strong that she shuddered and drew back. Bynum started back to Winston driving the car at a speed estimated by witnesses as between 50 and 60 miles per hour, with the sparks flying out from the manifold 7 or 8 inches long, passing car after car on this crowded thoroughfare, which was filled with cars coming back to the city, and in a race with Finley Horton, who immediately preceded him to the city, with whom he had made an agreement just before leaving the club to have a race. As the Tudor car approached Lovers' Lane, which was a public road extending from the Country Club, and immediately behind the high-powered car driven by Fin Horton in this race, Bynum turned too quickly in passing Martin Goodman's car striking the hub caps on the front wheel on the Goodman car, side-swiping and bending straight the bumper of that car. The Tudor car with its occupants was hurled over a barbed wire fence into an adjoining field, the car upside down, himself and brother severely injured, and with the almost lifeless body of Miss Tyree terribly disfigured hanging on the barbed wire fence. The speed at which he was running when he side-swiped the Goodman car was such that his car cut off 4 locust posts 4 to 6 inches in diameter as it was hurled into the field. The almost lifeless body of Miss Tyree hanging on the strands of the barbed wire fence, was in such a mangled condition that one of the young men fainted in attempting to remove it, and when taken to the hospital, where she died almost immediately, her body was in such a horrible condition that the hospital authorities would not permit her parents to see it.
The road was an improved highway, 50 feet wide, of which 20 feet in the center was concrete and 15 feet on each side, where the accident occurred, was a dirt road. Martin Goodman was driving on the right-hand side of the road and on the concrete near the edge. The Tudor car came up from behind without blowing the horn or giving any signal of its approach, and when it struck the Goodman car was running approximately 60 miles an hour. *Page 367 
Upon this record the jury answered the issues in favor of the plaintiff, and assessed the damages at $15,000. Judgment and appeal (343) by defendants.
This case was before us, 181 N.C. 215, upon facts substantially the same as in this appeal, and the Court held in an unanimous opinion that "Where the owner of an automobile has his son to operate it as his chauffeur, both for business purposes and for the comfort and pleasure of his family, and there is evidence that he has given his permission for that son, just over 16 years of age, to use it in escorting the plaintiff's intestate, a young girl of about the same age, to a dance, it is sufficient, upon the question of the agency of the son, to bind the father for negligence which proximately caused the death of the plaintiff's intestate when returning from the dance in the automobile"; also, that "It was the duty of the father not to entrust the safety of the young girl to his son unless he knew that he was careful and prudent in the operation of the machine, and he is responsible in damages for the death of the plaintiff's intestate proximately caused by his son's negligence in driving the machine while acting as an escort."
On this second trial, the evidence was much strengthened for the plaintiff by the testimony that about a month prior to the time of this occurrence the chauffeur, Bynum Tudor, had been driving this same car, racing with other cars along this same road between the Country Club and Winston-Salem; that two weeks prior to this time he had been indicted in Greensboro for violation of the automobile law, and his father, George C. Tudor, the defendant, had arranged the indictment; that on Sunday, two days prior to this occurrence, this 16-year-old son had violated the automobile laws by reckless driving on a street in Winston, and on the following day had been tried in the police court and his father, the defendant, had paid the fine. This was the very day before this lamentable occurrence. The father, therefore, had full notice of the reckless character of his son as a chauffeur, and his unfitness to be trusted in charge of an automobile, especially on an occasion of this kind involving the safety and life of a young girl.
There was, besides, on this trial, evidence of liquor being in the car, its distribution by the chauffeur and his older brother, also in the car, and the defendant's brief stresses the evidence that the chauffeur himself (though denied by him under oath) on that occasion was drinking, *Page 368 
if not intoxicated. There was much evidence, uncontradicted, of the disregard of the law, not only in reckless driving and speeding (344) far in excess of that forbidden by law, but according to the brief of defendant's counsel, of a violation of law against driving an automobile while being intoxicated. For these acts of negligence the defendant was responsible both for having placed his son in charge of the car and by reason of his liability for the negligence of his agent.
The plea of contributory negligence is thus set out: "Said Bynum Tudor undertook to pass one or more of said cars and to reach the home of plaintiff's intestate in advance of her guest, and that the rate of speed at which he was driving and his effort to pass cars were due entirely to the request of plaintiff's intestate; and the said plaintiff's intestate at all times acquiesced in and approved the method and manner of driving of Bynum Tudor, and these defendants plead as contributory negligence in bar of plaintiff's recovery the aforesaid acts and conduct of plaintiff's intestate."
It is not alleged, nor is there any proof tending to show that the unfortunate victim of this accident was an employee, or had any control whatever, or attempted to exercise, by any act, any control whatever over the operation of the car. The burden was upon the defendants to sustain the plea of contributory negligence by the greater weight of the testimony, and there is a want of any evidence sufficient to be considered by the jury, who, however, have negatived it. C.S. 523; Cogdell v. R. R., 132 N.C. 855(Walker, J.); Watson v. Farmer, 141 N.C. 454; Wright v. R. R., 155 N.C. 329(Allen, J.). The only proof offered was the testimony of George C. Tudor, Jr., the brother of the chauffeur, that on the way home Ruth Tyree asked Bynum Tudor to "get her home in a hurry in order to get there before Miss McKinsey, because if she did not get home before Miss McKinsey did her mother would think she had been riding after the close of the dance." This was properly excluded by the judge. It did not show any control of the car, or any request for an excessive speed, or tend to show that the request was the proximate cause of the death of this young girl. It was a perfectly reasonable request, and was not competent in any way to support the charge that the deceased was responsible or that the remark caused the occurrence.
But it is said that the following evidence, which was admitted by the court, should have that effect: Govan Caldwell testified that about three-quarters of an hour before leaving the Country Club for home, while the witness and Bynum were talking in the presence of Ruth Tyree about having a race with John Casper at a very rapid rate of speed, "Ruth said she wanted to go as fast as they had been going," *Page 369 
Bynum said, "Let's go now," to which she answered, "No, let's wait until we go home," and Bynum replied that he would run as fast as she wanted to.
That remark, which was no part of the res gestae, Barker v.In Co., 163 N.C. 175, though the judge admitted it, and the (345) excluded testimony that while in the car on the way home she requested Bynum to "get her home in a hurry, to get there before Miss McKinsey did, otherwise her mother would think she had been riding after the close of the dance," is all the evidence offered to place upon the head of this young girl the responsibility of being the cause of this terrible disaster! Neither the plea nor the evidence would have justified the jury to come to such a conclusion. To his credit, the boy himself did not on his oath make such assertion. On the contrary, in his testimony he swore frankly, "When I left the Country Club the reason I had for driving at the rate of speed I did was that I was going home. I wanted to pass another car — the car Miss McKinsey was in. I passed 3 or 4 cars to the best of my knowledge before I came to the Goodman car." He did not try to put the blame on the girl, but like a man he drove fast because he wanted to pass another car.
There is no evidence that Bynum Tudor knew what car Miss McKinsey was in, and the mere request by Ruth Tyree "to get her home in a hurry" did not license Bynum Tudor to drive at the terrific speed which was a violation of law. Besides, Fin Horton testified that he and Bynum had made an agreement to race back home and Bynum had offered to bet $5 on the result.
The jury found upon the issues submitted that: (1) The plaintiff's intestate was killed by the negligence of the defendant Bynum Tudor, as alleged in the complaint; (2) that Bynum Tudor was the agent or servant of the defendant George C. Tudor at the time mentioned in the complaint; (3) that the plaintiff's intestate did not contribute to her death by her own negligence, as alleged in the answer; and assessed the damages.
The very able counsel for the defense have presented every possible exception, but we do not consider it necessary to elaborate and discuss more fully the contentions presented.
The evidence offered as to the conduct and record of Bynum on that occasion and before was not to show his general reputation or character, but that he was a reckless driver and, taken in connection with other evidence, was proof that his father knew or should have known it. InLinville v. Nissen, 162 N.C. 100, it is held that the father would be liable for entrusting an automobile to his son if the father knew that the son was reckless and incompetent. *Page 370 
The evidence of negligence of the defendant is practically uncontradicted and the reliance of the defendants is upon the defense of contributory negligence. Notwithstanding that Bynum and his brother both testified that Bynum did not drink anything on that occasion, the brief of the defendant strenuously insists that he was intoxicated, and (346) that the young girl was guilty of contributory negligence in that she did not know this (for there was no evidence that she did), and did not get out of the car, which was one of the last to leave, at one o'clock in the morning, three miles from home, and the defendant's brief further stressed the proposition that she was guilty of contributory negligence in view of his fast driving because she did not get out of the car (running at times 60 miles an hour), and, therefore, she and not the defendants is responsible for her death. In Hunt v. R.R., 170 N.C. 442, the Court said: "It is held by the greater weight of authority that negligence on the part of the driver of an automobile will not, as a rule, be imputed to another occupant or passenger unless such other occupant is the owner or has some kind of control over the driver. This is undoubtedly the view prevailing in this State. See the learned opinion on this subject by Douglas, J., in Duval v. R. R.,134 N.C. 331, citing Crampton v. Ivie, 126 N.C. 894; both of these discussions being approved in the more recent case of Baker v. R. R.,144 N.C. 37. See, also, Bagwell v. R. R., 167 N.C. 611; McMillan v. R. R.,172 N.C. 853." This was quoted with approval in the very recent case of Pusey v. R. R., 181 N.C. 142.
In that case the defendant requested an instruction that the plaintiff should have remonstrated with the chauffeur if he was driving too fast and have declined to go with him if the driver was drinking, and if he did not it was contributory negligence. But the Court held that it was not error to refuse such instruction because "Pusey was a guest riding for the pleasure of the trip and had no control over the car and nothing to do with driving it."
It has been repeatedly held that for a person to be responsible for the operation of an automobile, he must be the owner of the car which is operated by some one under his authority and permission, or he must have control of the operation of the car, neither of which functions could be attributed to Ruth Tyree, who was a mere guest in the car which was entirely under the control of Bynum Tudor under the authority and by the permission of his father. The above proposition is sustained by unbroken authority in this State. Among other cases are Linville v. Nissen,162 N.C. 95; Taylor v. Stewart, 172 N.C. 203; Williams v. Blue,173 N.C. 452; Clark v. Sweaney, 175 N.C. 282; Wilson v. Polk, 175 N.C. 490. *Page 371 
In Williams v. Blue, supra, the Court said: "If it should turn out upon the trial that defendant Fannie A. Blue was exercising no control over the machine or chauffeur and was occupying it simply as the wife of John Blue and with his consent, then she would not be liable. As to the defendant Graham, . . . if it should turn out upon the trial that he did not assist in directing the operation and course of the machine at the time of the collision, he would not be liable." (347)
Among the later cases affirming this uniform doctrine of our courts isParker v. R. R., 181 N.C. 103, where, sustaining a verdict of $45,000 for damages sustained by a lady riding in her sister's automobile where the same defense of contributory negligence was set up, the Court said: "As to the contributory negligence, the burden of which was upon the defendants, the plaintiff was not driving the automobile, but was only a guest or passenger in the car. There is no evidence that she had any control over the movements of the car, and the negligence of the driver, if there was any, cannot be imputed to the passenger," citing numerous authorities.
In 2 R. C. L. 207, it is said: "The prevailing view is that where the occupant has no control over the driver, even in a case where the relation of carrier and passenger does not exist, the doctrine of imputed negligence does not apply."
In view of the negligence of the father in entrusting this machine and the custody of the young daughter of a neighbor to the care of a reckless and incompetent driver, as he knew his son to be, having but recently twice obtained his discharge from the law for reckless driving, once on the very day before, and in view of the overwhelming evidence of the chauffeur's reckless conduct and violation of law on this and previous occasions, it cannot be maintained seriously that the remark of the girl in a casual conversation three-quarters of an hour before leaving in the car that she would like fast driving (but which she declined at that time), and the offered testimony, which was properly excluded, that on the way home she said she wanted the chauffeur to get home ahead of a certain other car — that these remarks were the proximate cause that this car, running perhaps 60 miles an hour, was catapulted 36 feet, by striking another car, cutting down 4 locust posts 4 to 6 inches in diameter, seriously injuring both the young men, destroying the car, and ruthlessly extinguishing the life of this bright young girl, whose safety had been entrusted to their care. This defense that "the woman and not the man" was to blame has been often asserted throughout the ages, but never on slighter foundation, not even on that memorable occasion when it was first pleaded by Adam. Genesis, ch. 111:12. *Page 372 
The question of damages was fully discussed before the jury, and under a charge which was properly stated, following the uniform decisions of this Court. Hill v. R. R., 180 N.C. 492, and cases there cited by Walker, J.
The amount assessed by the jury is not reviewable by us, Benton v.R. R., 122 N.C. 1009; Cook v. Hospital, 168 N.C. 256, and if it were we could not say that the verdict of $15,000 for the untimely death of a young girl of about 16 years of age, who was shown to possess (348) good health, an excellent character, and more than usual ability, was excessive compensation for her death, under most distressing and painful circumstances caused by most inexcusable negligence on the part of the father and criminal negligence on the part of the son, to whose protection and care she had been confidingly entrusted by her relatives.
No error.