WILLIAM W. MILLER
vs.
C. CHARLES BURLINGAME, M.D.

Superior Court        Hartford County        File #53616A

Present: Hon. JOHN A. CORNELL, Judge.

Cramer & Guthrie,        Attorneys for the Plaintiff.

Robinson, Robinson & Cole, Attorneys for the Defendant.

## MEMORANDUM FILED APRIL 27, 1936.

CORNELL, J. On April 1st, 1936, William W. Miller, voluntarily entered the Hartford Retreat, seeking treatment for a condition caused by excessive indulgence in alcoholic drink.

When he presented himself with two friends before the admission clerk, he was asked to and did subscribe a writing which reads as follows:

"Hartford, Conn., April 1, 1936.

As of this date, April 1, 1936, I hereby commit myself to the care, custody and control of C. Charles Burlingame, M.D., Psychiatrist-in-Chief of the Neuro-Psychiatric Institute of Hartford Retreat for treatment and restraint as an inebriate in accordance with the provisions of **Chap. 92, Sec. 1793, Revision of 1930, Connecticut Statutes.**

Dated at Hartford, Conn., this 1st day of April, 1936.

(signed)    William Miller.

Mary Cronin,
P. M. Kidney, Witnessed."

**Chapter 92, of the General Statutes** concerns itself with the commitment of inebriates, dipsomaniacs and others who are victims of the narcotic or alcoholic habits; **Sec. 1791** contained therein has to do with such commitments by Probate Courts upon the application of relatives or the selectmen of the town where the person effected resides.

**Section 1793** referred to in the quoted writing reads as follows:

". . . . Voluntary Patients at Asylums. The mana-gers, trustees or directors of any inebriate asylum, estab-lished by the laws of this state may receive any inebriate or dipsomaniac who shall apply to be received into such asylum, retain him one year and treat and restrain him in the same manner as if committed by the court of probate."

It appears that Miller now feels recovered and wishes to leave the Hartford Retreat but the respondent claims that the treatment which he has received is too brief in duration to insure permanent benefit and restrains him from going forth under the claimed authority of the statute, which, he maintains authorizes him to keep Miller in his care, control and custody for a maximum period of one year.

The writ of habeas corpus which has been sued out al-legedly because the respondent holds Miller imprisoned "with-out law or right" comes here, not upon the application of the "imprisoned" one but upon that of Ralph S. Miller who does not describe himself therein as a near relative or as otherwise having any such interest in the detained person as would justify him in obtaining the relief sought in behalf of him whose rights are allegedly violated.

The evidence, however, shows Ralph S. Miller to be a brother of the "imprisoned" William W. Miller. While, ad-mittedly, there are circumstances under which such a near rela-tive may obtain the writ in another's behalf, this is not ordin-arily so where no reason appears to explain why the detained person does not personally apply and especially so in the ab-sence of an allegation to the effect that the applicant acts with the authority of the person imprisoned.

However, the defect, if it be one, has not been urged, from which it is assumed that the respondent, as well as the confined one, is more anxious to obtain a decision on the merits than to explore the lore of prerogative writs. The court will accordingly treat the writ as that of William W. Miller and hereafter will refer to him as the relator.

Two reasons are advanced by the respondent as legally justifying his continued detention of the relator, viz., (1) that relator under the writing signed by him consented that he be kept in respondent's control for a maximum period of one year, and (2) when he voluntarily applied for treatment as an inebriate or dipsomaniac, and was received, these two events constituted a self-commitment under the provisions of the statute **(Sec. 1793, supra)** for not more than one year.

As to the first of these (waiving the question of whether the relator was competent to so bind himself) what little authority has been called to the court's attention fails to sustain respondent's contentions. Thus, it has been held that a similar consent or authority was not irrevocable. **Cook vs. Highland Hospital, et al, 168 N.C. 250, 84 S.E. 352, 355.** See, also, **In The Matter of Baker, 29 How. Pr. (N.Y.) 485.** Neither is the fact that in the opinion of the institution's authorities the patient requires further treatment, or may even become a public charge, legal justification for detaining him against his will. **In re: Carlson, 130, Fed. 379.**

As to the second, on analysis of the statute governing such commitment, it does not appear that respondent falls within the purview of **Sec. 1793,** upon which he relies.

In the first place, the latter statute designates "the managers, trustees and directors of any inebriate asylum" etc., as the authority which may receive applicants. As applied to the Hartford Retreat, this would mean its board of directors. The writing signed by relator, however, states that the latter committed himself, "to the care, custody and control of C. Charles Burlingame, M.D." who is then described as "Psychiatrist-in-Chief of the Neuro-Psychiatric Institute of Hartford Retreat". These are words of description which identify Dr. Burlingame, but, of course do not designate him as either the board of directors or the Retreat itself.

This language is strongly susceptible of the interpretation

that by analogy to a proceeding on an application to a probate Court under the provisions of Sec. 1791, the relator placed himself in "the care, custody and control of some suitable individual" that "suitable individual" being Dr. Burlingame who exercised that "care, custody and control" by affording him treatment in the institution with which he is connected in an important capacity.

It is significant that it is Dr. Burlingame who is named as the respondent—not the Hartford Retreat, or its board of directors, and that the return shows that relator is confined in the latter institution only "under and by virtue of a voluntary commitment dated April 1, 1936 . . . ." This latter is the writing in which the relator placed himself under "the care, custody and control" of Dr. Burlingame—not the Hartford Retreat or its board of directors.

Whatever the effects of the provisions of **Sec. 1793** may be where "the managers, trustees or directors of an inebriate asylum" receive inebriates or dipsomaniacs upon their voluntary application, there is no authority contained in it which confers upon any individual a right of care, custody or control of a person falling within either of these classes upon the voluntary submission of such a person as there is under **Sec. 1791** upon proceedings in a probate court.

On such a state of facts, it necessarily follows that while relator, of course, had the right to submit himself to treatment by the respondent, and the respondent the right to administer it in the Hartford Retreat or elsewhere so long as relator authorized him to do so, nevertheless when relator saw fit to end the relationship, he divested respondent thereafter of every specie of "care, custody and control".

If the record and the evidence may permissibly be ignored and the Hartford Retreat, instead of Dr. Burlingame treated as the real respondent, a second consideration militates against the validity of the respondent's claims, in this:

The particular kind of institution whose "managers, trustees and directors" are authorized to "receive any inebriate or dipsomaniac" who voluntarily applies for admission is an "inebriate asylum". An inebriate is elsewhere defined (**Sec. 1784**) as including "all male habitual drunkards or dipsomaniacs who have lost the power of self-control by the intemperate use of stimulants or narcotics".

The Hartford Retreat is said in the special law incorporating it, **Special Laws Vol. 1, p.** 342, 1924, to be a place for the treatment of insane. It appears that it has expanded its activities to include all kinds of psychiatric treatments and so no longer limits itself to cases of pronounced or definite insanity and that it only receive inebriates and dipsomaniacs on the theory that some psychiatric affliction or disturbance is the activating influence in excessive addiction to alcoholics.

Even if this liberal means of identifying its activities and hence its character, be accepted, it still remains and insists upon being regarded as an institution for the treatment of mental and nervous ills.

Our statutes treat institutions for the insane and those for inebriates and dipsomaniacs as distinct. Witness the provisions of **Sec. 1784** which, though placing the State Farm for Inebriates under the control and management of the board of trustees of Norwich State Hospital, direct that it be and remain a separate department. And those of **Sec. 1789** which provide, if an inebriate becomes insane, for his transfer to an institution for the treatment of the insane.

Whatever the index which psychiatric experts may use, it is evident that when the General Assembly employed the term "inebriate asylum" in **Sec. 1793**, it was used as the whole body of statutes on the subject indicates, as meaning an institution devoted to the care and treatment of those afflicted by the ills consequent on excessive indulgence in alcohol and narcotics and not an institution affording treatment for nervous and mental ills.

Still indulging the assumption that the Hartford Retreat rather than the named respondent, personally, is the real respondent here, yet another consideration inimical to respondent's contention, obtrudes.

Hartford Retreat is a private corporation. The fact that state funds are contributed to aid its activities, if they are, from time to time, does not divest it of this character. It owes its existence to a special act of the General Assembly which, of course, conferred no powers or authorities upon it until it was accepted by its incorporators. It was this latter act which vitalized it and thus, "established" it as a corporation.

But **Sec. 1793** speaks only of those "inebriate asylums" "established by the laws of this state". This language, in view of the other provisions of the statute, appears to connote only those institutions whose existence become perfected by the approved acts of the General Assembly, for it is the law of the **state** which "establishes" them and not such as become "established" only by virtue of a final act performed by a group of individuals. The use of the phrase "established by the laws of the state" rather than "conducted" or "operated" in this state or some equivalent phrase, seems significant in the light of the following observations:

The State has established and maintains a State Farm for Inebriates. Aside from the provisions of **Sec. 1793**, one may be committed to it (1) in a criminal prosecution under the provisions of **Sec. 1785**; (2) by order of a probate court upon the application of a friend, relative or the selectmen of the town where the effected person resides under the provisions of **Sec. 1786** or (3) by the probate court under the provisions of **Sec. 1791** upon the application of a relative or the selectmen of the town where the affected person resides.

To be eligible under the latter statute one need not be a common drunkard or have been thrice convicted of intoxication as under **Sec. 1785**. It is sufficient qualification if one be found to be "so far addicted to the intemperate use of narcotics or stimulants as to have lost the power of self-control".

But while commitment under the provisions of **Sec. 1785** and **Sec. 1786** to the State Farm for Inebriates is obligatory, it is not under **Sec. 1791**. In proceedings under that section the order may be that the person "be taken to some inebriate asylum in this state (which, of course, includes privately owned and operated institutions like Hartford Retreat) for treatments, care and custody" or even that he be merely "committed to the care, custody and control of some suitable individual", and if he be placed in an inebriate asylum he may be released therefrom by its managers under the provisions of **Sec. 1792** pursuant to its (own) regulations.

Those committed under the provisions of **Sec. 1791** are presumptively able to pay for the treatment which they receive, since **Sec. 1795** makes their estate liable for same, while the cost of one committed to the State Farm for Inebriates under **Sec. 1785** in a criminal prosecution are to be paid by

the town, city or borough in which the court making the commitment is located unless it be made by a Court of Common Pleas or the Superior Court; and in the case of those committed to the State Farm of Inebriates by a probate court under **Sec. 1786** the cost of support is to be borne by their estates to the extent of $3.00 per week or for such less amount as shall be determined by the trustees to be the net average cost per week of the support of each inmate of the farm, etc.

But **Sec. 1795,** which provides for the reception in inebriate asylums of those who chose to apply for treatment there, applies to "any inebriate or dipsomaniac" and so includes the impoverished, as well as the affluent.

If the phrase "may receive" be construed to mean "shall receive" the inevitable effect would be that private institutions would be obligated to accept and treat all who might elect to sojourn with them so long as the applicants could qualify as inebriates or dipsomaniacs. Such inebriate asylums would then be compelled to look to the estates of such persons— often nonexistent—for compensation. Such an intent can hardly be attributed to the legislative authority.

On the other hand, however, if the phrase "may receive any inebriate or dipsomaniac" as used in **Sec. 1793** be construed to be permissive only, then, of course, it cannot apply to private institutions since no statutory permission is required to enable them to exercise the right of receiving whom they will and rejecting those whom they either do not care to or cannot effectively treat.

Such a phrase so construed attains significance, however, if the statute be interpreted as applying only to such inebriate asylums as have been or may be established, maintained and operated by the state, since without it they would be powerless to admit persons in need of and seeking treatment, unless such persons were committed to them as the result of criminal proceedings in which they would be designated as common drunkards or proceedings in a probate court in which they would be adjudged inebriates, dipsomaniacs or so addicted to the use of alcohol or narcotics as to have lost the power of self-control.

It results from the interpretation given **Sec. 1793** herein that the relator is not confined in accordance with the provi-

sions of **Sec. 1793** as the return claims and that he is being held in the "care, custody and control" of respondent illegally and in violation of his rights. He is, consequently entitled to be released from the confinement. Judgment may enter accordingly.

The conclusions reached, it will be evident, would make pointless any discussion of the effect of **Sec. 1793** as concerns confinement without due process of law under either State or Federal constitutions. They uphold, or, at least, do not bring into question the validity of the statute—a construction to be adopted in preference to one which assails the validity of the legislative expression.