## STATE v. JOHN GODETTE.

(Filed 29 October, 1924.)

**1. Appeal and Error—Objections and Exceptions—Briefs.**

Exceptions not mentioned in the appellant's brief are deemed abandoned on appeal to the Supreme Court, under the rule.

**2. Constitutional Law—Criminal Law—Arrests—Warrants.**

The first ten amendments to the Constitution of the United States are in recognition of the principles of the organic law as previously existing in England, the fourth amendment requiring warrants to be issued upon probable cause applying only to criminal actions in the Federal Courts, and the due-process clause, etc., of the Fifth Amendment, relating to the orderly procedure in the State courts. The first ten amendments apply only to the Federal Government.

**3. Same—Statutes—Turlington Act.**

The provisions of the Turlington Act, Public Laws of 1923, permitting the seizure of intoxicating liquor being unlawfully transported and of the conveyance in which it is being done, when the officer sees or has absolute knowledge that there is intoxicating liquor in such vehicle, do not contravene the provisions of the State Constitution, Art. I, secs. 11 and 15.

**4. Same—Evidence—Questions for Jury.**

Where there is evidence that acting upon information previously received that intoxicating liquors are being unlawfully transported, the proper officers of the law lie in wait for and follow automobiles, and can see containers and smell the liquor, they have a right to arrest without warrant and seize the vehicle.

**5. Same—Officers—Unlawful Acts.**

The arrest by the officer of the law of the defendant without a warrant, while unlawfully transporting intoxicating liquor, being valid under the provisions of our statute, it may not successfully be maintained that evidence thereof should have been excluded, and that upon a trial for unlawfully transporting liquors under the Turlington Act, his motion for nonsuit upon the evidence found therein should have been .granted.

APPEAL by defendant from *Daniels, J.,* and a jury, at June Term, 1924, of CRAVEN.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*Ernest M. Green and W. B. R. Guion for defendant.*

CLARKSON, J. The defendant was convicted in the court below of aiding and abetting in the transportation of intoxicating liquors and sentenced to be confined in the common jail of Craven County for a period of 18 months, to be assigned to the county roads.

32—188

There are thirty exceptions and assignments of error made by defendant in the case on appeal. The brief is confined to a discussion of the validity of the evidence obtained from an examination of an automobile which contained liquor without a search warrant. The other exceptions are deemed to be abandoned. Rules of Practice in the Supreme Court, part of Rule 28 (185 N. C., p. 798), is as follows: "Exceptions in the record not set out in appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned by him." *Bank v. Smith,* 186 N. C., p. 640.

At the close of the State's evidence, "the defendant again renewed his objection to the testimony of the officers acquired through the unlawful search and especially plead the protection of the Federal Constitution in particular the 4th and 5th amendments; the Constitution of the State of North Carolina, Art. I, secs. 11 and 15, and chapter 1 of the Public Laws of 1923; moved to strike out all such questions and answers and moved that the action be dismissed; that the jury be instructed that if they found from the evidence the facts to be as testified by the witnesses they should return a verdict of not guilty."

The court below overruled the motion and the defendant excepted. At the close of all the evidence, the defendant renewed his motion and all of his objections, which were overruled, and defendant excepted. There was a verdict of guilty and from the judgment pronounced the defendant excepted and assigned error, in accordance with the exceptions taken, and appealed to the Supreme Court.

This brings us to consider the law and the evidence in the case.

Const., of U. S., 4th Amendment, is as follows: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized."

The 5th Amendment to the Constitution of United States, is as follows: "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use without just compensation."

Article I, sec. 11 of the Constitution of North Carolina, is as follows: "In all criminal prosecutions every man has the right to be

informed of the accusation against him and to confront the accusers and witnesses with other testimony, and to have counsel for his defense and not be compelled to give evidence against himself or to pay costs, jail fees, or necessary witness fees of the defense, unless found guilty."

Article I, sec. 15, *supra,* is as follows: "General warrants, whereby any officer or messenger may be commanded to search places, without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted."

The Legislature of this State, Public Laws 1923, ch. 1, sec. 6 (passed what is known as the Turlington or Conformity Act) in part, is as follows: "When any officer of the law shall discover any person in the act of transporting, in violation of the law, intoxicating liquor · in any wagon, buggy, automobile, water or air craft, or other vehicle, it shall be his duty to seize any and all intoxicating liquor found therein being transported contrary to law. Whenever intoxicating liquor transported or possessed illegally shall be seized by an officer he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof." Provision is made for the owner to give bond with sureties for return of property on day of trial to abide judgment of court, etc., and the following *proviso* is in the section: *"Provided,* that nothing in this section shall be construed to authorize any officer to search any automobile or other vehicle or baggage of any person without a search warrant duly issued, except where the officer sees or has absolute personal knowledge that there is intoxicating liquor in such vehicle or baggage."

The Constitutions of the United States and North Carolina are the fundamental and organic laws of our land. The courts should be careful to uphold the provisions.

The defendant in his brief says: "The General Assembly of North Carolina, still true to the ideals of the fathers, inserted the above *proviso"* in what is known as the Turlington or Conformity Act, *supra.*

The question presented: Was the testimony of the officers and the intoxicating liquor seized admissible without a search warrant? We are of the opinion that both were admissible.

We must consider the evidence. The solicitor of the Fifth Judicial District, Jesse H. Davis, employed a detective, E. H. Gattis, to work in Craven and Carteret counties, and obtain evidence looking towards the breaking up of the unlawful manufacture and sale of liquor. The detective was coöperating with the Federal prohibition agents. Prior to the day Godette, the defendant, was arrested the detective saw the defendant and one Ward at a still. In a conversation he heard Godette say he was to deliver a load the next night at 9 o'clock in New Bern.

On this and other information he had as to who was going to bring it, he informed the solicitor, the morning before the night the defendant was arrested, and notified the solicitor to get his men ready and look out. Gattis testified that there was not only Godette, but five cars from Raleigh down there. "I knew I could clean up the whole gang." He told Solicitor Davis about the five cars from Raleigh and that they would buy it at wholesale in 100 gallon lots.

That night, 20 September, 1923, the Solicitor Jesse H. Davis, E. H. Gattis, Capt. Ed. Belangia, chief of police of New Bern; Lt. Gus Ipock, a policeman; Deputy Sheriff Bill Whitford and Roy Manning, District U. S. marshal, went to the Neuse River bridge about 7 o'clock and waited. About 9 o'clock, two cars came upon the bridge, one behind the other. John Godette, the defendant, came along in his Cadillac car driving slow, and close behind him, about 25 yards was a Buick car. Captain Belangia, Marshal Manning and Lieutenant Ipock were in Manning's car. It was turned around and came across the bridge and went up South Front Street and followed behind the two cars (the Buick and Cadillac). They went up South Front Street to Spring Street and turned into Spring Street, then up to New South, then into German Street. When they came up about midway German Street, the Buick was parked on the left-hand side. Two people were in the car trying to start it, and as Captain Belangia and Deputy Manning got close to the car, they jumped out and ran. The Cadillac had also stopped about 30 feet away, just across the street. By the time the officers got to the Buick, the two people had made their escape. Some one remarked "Stop the Cadillac." Ipock hollered to the driver to stop and fired on the ground, and the Cadillac left at a rapid speed, but returned in 5 or 10 minutes. Captain Belangia said he did not have personal knowledge that liquor was in the Buick car, he could not tell as it passed him, but it looked like it was loaded. When defendant returned he stopped his car opposite, and Captain Belangia "told him to consider himself under arrest, and he said 'all right.'" Captain Belangia testified: "I asked him if the Buick was his car and he said 'I don't know, I will have to go see.' He got out of the Cadillac went over to the Buick and behind it looking at it and said, 'Yes, sir, that is my car.' He said that it had been missing two or three days." Captain Belangia was asked:

"Q. Was there anything in the Buick car to your knowledge? Answer: 'Well, it smelt like whiskey.'

"Q. Do you know how much there was in it? Answer: 'Eighty-nine gallons.'"

Lieutenant Ipock testified, in part: "I was with the party on the bridge. We were there waiting for some cars. We had been talking

about whiskey haulers. I was standing by the automobile when John (the defendant) came along with his car, and right behind it, as near as it could follow, was this Buick car. It was loaded with something and there was a few of the containers that were not covered that I could see. . . . We saw the Buick stop in front of George Carter's house. We drove up beside this car and I told them to halt, but they rolled right out from under the wheel and left. This was a short distance from the defendant's car. I fired on the ground, but these two men kept going. Godette left at a rapid rate of speed, but later returned. . . . I was in uniform which had bright brass buttons on it. . . . The moon was shining brightly and the defendant was approaching with full lights in front of me. He could have recognized me. I did not undertake to stop it nor did I undertake to stop the second car. Both cars were running very slowly about as slow as they generally go at any time. I did not see nor did I have absolute personal knowledge that the second car contained liquor. I know that it contained kegs, but I did not know what was in the kegs. I did not smell it. I did not smell it when it passed. I have never examined the kegs to see what they contained, but when we searched the Buick the odor proved that the kegs contained whiskey. I did not shoot at the defendant. I shot at the ground. I was trying to hold the two men that ran from the Buick car. Solicitor Davis was standing by our Ford car when the defendant passed us on the bridge. No one commanded the defendant to stop, and none of us had a search warrant or any other kind of warrant for the defendant."

All the officers there knew the defendant and the defendant knew all of them.

Deputy Will Whitford, testified: "I could see the top of the kegs, but I could not smell anything."

For the purposes of trial, defendant's counsel admitted that the Buick car contained whiskey. It was admitted by the State that no search warrant had been sworn out for searching said car.

S. H. Fowler, a witness for defendant, testified: "The Buick car was in very poor condition. It was an old $1,700 car that had been sold to Godette for $350."

It will be noted that defendant calls to his aid the 4th and 5th amendments to the Constitution of the United States, and cites the cases of *Gouled v. U. S.,* 255 U. S., p. 296 and *Amos v. U. S.,* 255 U. S., p. 313. We do not think those cases are applicable to the facts in this case. These amendments apply only to the *Federal Government.* They are persuasive, and should be, but not binding.

"All of the amendments proposed by the first session of Congress, consisting of the first ten, were intended to apply only to the Federal

Government, and not as restrictions on the State governments. They were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities inherited from our English ancestors and from time immemorial." Const. of U. S., Anno. (1923), p. 521, citing numerous authorities.

The U. S. Court, in *Brown v. New Jersey,* 175 U. S., 175, citing numerous authorities, says: "The first ten amendments to the Federal Constitution contain no restrictions on the powers of the State, but were intended to operate solely on the Federal Government." *Ensign v. Pennsylvania,* 227 U. S., p. 592. *S. v. Campbell,* 182 N. C., p. 911. This case was taken to the Supreme Court of the United States on writ of error and affirmed. 262 U. S., p. 728; *S. v. Simmons,* 183 N. C., p. 684.

"It is however, necessary, to observe the substantial distinction between the Fifth Amendment, which is obligatory only on the United States, and the Fourteenth Amendment, which is obligatory only on the states. The limitation in the former is 'without due process of law.' In the Fourteenth Amendment this limitation is accompanied with a prohibition of the denial of the 'equal protection of the laws.' " *U. S. v. New York, etc. R. Co.,* 165 Fed., 742. "This amendment only announces and reaffirms the ancient principles of the common law, and prevents them from being unjustly invaded by the power of the Federal Government." *North Carolina v. Vanderford,* 35 Fed., 282.

In *Traux v. Corrigan* (257 U. S., 312) the Court, considering the relations of this and the equal-protection clauses, says, in general: "The phrase, 'due process of law,' is, in terms, extended to the States by this amendment. As applied to the States the guaranty adds nothing to the right of one citizen against another, but simply prevents any encroachment by the State upon the fundamental rights which belong to every citizen. 'Due process of law,' as here used, refers to the law of the land in each State, deriving its authority from the inherent and reserved powers of the State, exerted within the limits of the fundamental principles of liberty and justice underlying our civil and political institutions. What is due process of law in the respective State is regulated and determined by the law of each State, and this amendment in no way undertakes to control the power of a State to determine by what process legal rights may be asserted or legal obligations enforced, provided the method of procedure adopted for these purposes gives reasonable notice and affords a fair opportunity to be heard before the issues are decided. The courts will interfere with State action on the ground that it is repugnant to this clause only where fundamental rights have been denied." Const. of U. S., Anno. (1923), pp. 633, 634, citing numerous authorities.

In North Carolina it has long been the law that a physical fact or condition which was brought out by the illegal action of an officer may be given in evidence against the defendant. *S. v. Graham,* 74 N. C., 646 (prisoner compelled by officer to put shoe in track). This case has been approved in many decisions since, including *S. v. Mallette,* 125 N. C., 725, which case was affirmed in the United States Supreme Court on writ of error in *Mallett v. North Carolina,* 181 U. S., 589; *S. v. Thompson* 161 N. C., 238 and *S. v. Neville,* 175 N. C., 731. There are quite a number of courts that disagree with the principle established by *S. v. Graham, supra.* Some of these decisions are cited by the defendant in his brief. We do not think the action of the officers illegal in the present case.

The language of the Conformity Act of this State, *supra,* is plain: that when any officer of the law shall discover any person transporting or possessing liquor in violation of law, that is when he sees or has absolute personal knowledge, the liquor and vehicle shall be seized and the person in charge arrested.

The officer can arrest (1) when he sees the liquor; (2) when he has absolute personal knowledge. The latter is defined in the law. In 9 Gray Mass., 271, "Knowledge, being a firm belief." In *West v. Home Ins. Co.* (C. C.) 18 Fed., 6, it was held: "Personal knowledge—knowledge of the truth in regard to a particular fact or allegation, which is original, and does not depend on information or hearsay."

This absolute personal knowledge can be acquired through the sense of seeing, hearing, smelling, tasting or touching. In Blakemore on Prohibition (1923) p. 332, it is said: "Under the Federal as well as the State statutes, to justify search and seizure or arrest without warrant the officer must have direct personal knowledge, through his hearing, sight or other sense of the commission of the crime by the accused. But it is not necessary that he should actually see the contraband liquor. . . . (*supra,* p. 334.) If an officer sees intoxicating liquor being loaded on an automobile he can thereupon seize the vehicle and arrest the person who has put liquor on it, and other palpable conditions might authorize similar action, as plainly seeing the liquor leaking from a vehicle in which it is being transported, such a leak extending itself upon the public highway and the spirits spreading themselves and their odor along the road. . . . (*supra,* p. 335.) Where the prohibition enforcement officers believe on account of the conduct of the defendant that he is engaged in transporting liquor illegally, they may act without a search warrant. So where the officers are informed by a witness that the defendant had placed in his automobile a bottle containing a fluid that looked like whiskey, and stopped in front of a hotel and went to the proprietor and tried to sell it, and had a large box in the car covered

up, and the officers on receipt of this information go to the car and uncover the box and find whiskey there, they are justified in arresting the defendant and seizing the car and the whiskey. The court in this case points out that the prohibition of the Fourth Amendment is against all unreasonable searches and seizures, and whether such search and seizure is or is not unreasonable must be determined according to the facts of the particular case, and in this case the actions of the defendant were of themselves enough to justify the officers in believing that the defendant was at the time actually engaged in transporting liquor illegally. *Lambert v. U. S.,* 282 Fed., 413." In that case it was said: "They were therefore justified in arresting him and in seizing the automobile by means of which he was committing the offense—just as peace officers may lawfully arrest thugs and burglars, when their actions are such as to reasonably lead the officers to believe that they are actually engaged in a criminal act, without giving the criminals time and opportunity to escape while the officers go away to make application for a warrant." *Ash v. U. S.,* Fed. Rep., vol. 299, p. 277 (20 May, 1924).

In Blakemore on Prohibition, *supra,* p. 337, it is said: "Where the Federal officers saw a truck loaded with barrels about to start from a brewery and suspected that the truck contained real beer and stopped it and tested it and found that it was beer and seized it, the court holds that the action was legal although without any search warrant. The court lays down the rule that if the Federal officers, from the exercise of their own senses, coupled with information from sources so reliable that a prudent and careful person having due regard for the rights of others would act thereon, have reasonable and probable cause to believe that an offense of unlawful transportation is being committed in their presence and have no opportunity to obtain a warrant, they may arrest, search and seize. The Court distinguishes this case from the *Gouled case,* as here the seizure was not merely of evidence but the *seizure here is of contraband.* (Italics ours.) *U. S. v. Hilsinger,* 284 Fed., 585." In distinguishing the *Gouled case, supra,* the late lamented *Clark, C. J.,* in *S. v. Simmons, supra,* p. 686, takes the same view.

It is imperative that officers of the law should obey the law, but nothing does more to undermine orderly government than that those in authority, being unmindful of their duty to society, fail to enforce the law. We have a contention here, made by defendant, that the officers of the law failed to observe the law. We think the position taken is not borne out or justified by the record.

The most responsible law officer of the district, the solicitor, finds that there is a "gang" (the language of the witness) handling *contraband liquor.* He employed a detective and the detective informs him that at a still they are hauling the liquor out in 100 gallon loads—five cars

from Raleigh. That from what he heard and on information obtained, Godette, the defendant, was to deliver a load at 9 o'clock in New Bern on a certain night. The solicitor had the officers of the law to be in waiting at the Neuse River bridge. True to the information given, Godette, leading the way in a Cadillac, had trailing him in his Buick car two negroes with 89 gallons of liquor. The officers let the two machines pass and followed. When they got midway of German Street in New Bern these bold violators of the law had parked the Buick in the heart of the city and were trying to start it, and, as the officers came near the car, they jumped out and ran. The chief of police said: "Well, it smelt like whiskey." As the Buick car passed him it looked like it was loaded. Lieutenant Ipock, as the Buick passed, said he could see it was loaded with something and he could see a few of the containers that were not covered. The officers could see the load and containers and smell the liquor. What more absolute personal knowledge, under the law, could they have? The Buick occupants fled, so did the defendant. He returned and admitted that it was his Buick. It had 89 gallons of liquor in it, that was trailing his Cadillac, and the chief of police arrested him without warrant for aiding and abetting in transporting liquor. The officials had a right under the law to seize the contraband liquor and arrest the defendant without warrant under the facts and circumstances of this case. Godette, in violation of the laws of his country, and the jury found, was aiding and abetting in the transportation of contraband liquor, that by common knowledge is impure, poisonous and deadly, destructive of home, health and happiness.

As this case is of some importance, we have discussed the law fully. It is to be noted, however, that the two occupants of the Buick car, that had the contraband liquor in it, fled and abandoned it. The officers' search then of the car, under such conditions, could, we think, in no sense offend against the Constitution or statutes of North Carolina.

From the record there was abundant evidence to go to the jury as to the guilt of the defendant. We can find

No error.