STATE v. R. F. SIMMONS AND E. S. SMITH.

(Filed 8 December, 1926.)

**Homicide—Spirituous Liquors—Intoxicating Liquors—Arrest—Statutes—Suspicion—Search Warrant—Manslaughter.**

> Under the provisions of our statute, 3 C. S., 3411(f), an officer of the law is required to have a search warrant or have personal knowledge of the fact committed in his presence, to make an arrest of those who are transporting spirituous liquor in violation of the statute, and for him to fire upon a passing automobile with only an erroneous suspicion that the occupants thereof were thus unlawfully engaged, is without warrant of law, and the unintentional killing of one of those suspected as a result, is manslaughter at least, and a verdict thereof under conflicting evidence will be sustained on appeal.

CLARKSON, J., concurring in the result.

APPEAL by defendants from *Webb, J.,* at April Term, 1926, of SURRY. No error.

Indictment for murder. From judgment upon the verdict that defendants are guilty of manslaughter, both defendants appealed to the Supreme Court.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*Carter & Carter and Folger & Folger for defendants.*

CONNOR, J. Each of the defendants fired his pistol, several times, at an automobile in which deceased and two other boys were riding, after the automobile has passed defendants, on a public road in Surry County. A bullet fired by defendant, R. F. Simmons, entered the head of deceased, behind his ear, and inflicted the fatal wound. Both defendants had fired at the automobile with their pistols as it approached

them, and both continued to fire at it after it had passed them. Each defendant fired with the same motive, both with a common purpose, to wit, to stop the three boys who were in the automobile, in order that they might search it and ascertain whether or not they were transporting intoxicating liquor in violation of the laws of this State, and if so, to arrest them.

Both defendants were at the time deputy sheriffs of Surry County. In consequence of information which they had received, they had stood by the roadside, awaiting the approach of the automobile. They suspected that its occupants had gone across the State line into Virginia for intoxicating liquor, and were returning to Mount Airy, or its vicinity, with intoxicating liquor in the automobile. Neither of defendants had a warrant for the arrest of deceased or of his companions, or for the search of the automobile. Neither of the defendants had any personal knowledge that either of the boys was violating the law, or that there was any intoxicating liquor in the automobile, when they began firing their pistols for the purpose of causing the driver to stop. Defendants knew that the boys in the automobile had reputations for dealing in liquor, and suspected that they were then transporting liquor in the automobile.

They knew two of the boys, Johnny and Melvin Joyce, personally, and knew where they lived in Surry County. They had been informed that deceased, Jim Sutphen, had gone with the other boys on their trip to get intoxicating liquor. Each of these boys was about twenty years of age—two of them married. Deceased lived with his uncle, who operated a sawmill and gristmill, about three miles from Mount Airy, on Route No. 80 of the State highway system. All of them could easily have been apprehended at their homes in Surry County if they were violating the law.

Both Johnnie and Melvin Joyce testified that there was no liquor in the automobile when defendants undertook to stop them by firing their pistols. There was evidence that their general character for truth and honesty were good, but that they were "rough boys," and were suspected of handling liquor. There was no evidence at the trial that either of the boys was violating the law in any respect or that there was intoxicating liquor in the automobile when defendants attempted to search the automobile and to arrest the occupants.

Defendants testified that they stepped from the side of the road, where they had been standing, in front of the automobile, and called to the driver to stop; that the driver did not stop, but increased his speed; that they both then fired at the automobile; that the driver attempted to drive over defendant Simmons, and that after the automobile had passed them, each fired several times for the purpose of shooting the

tires, and thus causing the driver to stop. Johnnie Joyce, who was driving the automobile, testified that neither of defendants called to him to stop before they both fired. His brother, Melvin Joyce, corroborated him. There was evidence that both defendants are men of good character.

There was no exception to the admission or exclusion of testimony as evidence which we deem it necessary to discuss. There is no conflict in the evidence upon essential matters. The evidence is plenary that a bullet fired by defendant Simmons, while engaged in an unlawful act, caused the death of deceased, and that defendant Smith was present not only aiding and abetting defendant Simmons, but actively participating in the unlawful act. The evidence fails to show any facts which justify or excuse defendants. The defense urged in behalf of defendants, either that the pistols were fired by them in self-defense, or that defendants were justified in shooting because they were officers undertaking to make a lawful arrest or a lawful search of the automobile cannot be sustained by the evidence. We find no error in the full and careful charge of his Honor to the jury. Assignments of error based upon exceptions duly taken thereto, are not supported by the law.

Section 6 of ch. 1, Public Laws 1923, known as The Turlington Act, 3 C. S., 3411(f), contains the following words:

"Nothing in this section shall be construed to authorize any person to search any automobile or other vehicle or baggage of any person without a search warrant duly issued, except where the officer sees or has absolute personal knowledge that there is intoxicating liquor in such vehicle or baggage." See *S. v. Godette,* 188 N. C., 497. In the absence of a search warrant, or of absolute personal knowledge that there is intoxicating liquor in the automobile, defendant's attempt to search it was without authority of law. Defendants had neither a search warrant nor absolute personal knowledge, required by the statute for a lawful search of the automobile for intoxicating liquor.

In *S. v. Sigman,* 106 N. C., 728, in the opinion written by *Avery, J.,* the law is stated to be as follows: "An officer who kills a person charged with a misdemeanor while fleeing from him is guilty of manslaughter at least. 1 Wharton Crim. Law, sec. 5 (9 ed.); 2 Bishop Crim. Law (7 ed.), sec. 649. After an accused person has been arrested, an officer is justified in using the amount of force necessary to detain him in custody, and he may kill his prisoner to prevent his escape, provided it becomes necessary, whether he be charged with a felony or misdemeanor. But where a prisoner charged with a misdemeanor has already escaped, the officer cannot lawfully use any means to recapture him that he would not have been justified in employing in making the first arrest; and if in the pursuit he intentionally killed the accused,

it is murder; and if it appear that death was not intended, the offense will be manslaughter." See *S. v. Dunning,* 177 N. C., 559. The law will protect an officer who is attempting to make a lawful arrest or to make a lawful search, from consequences of his acts done necessarily in the performance of his duty. This principle cannot be invoked, however, in defense of an officer who in attempting to make an unlawful arrest or an unlawful search, commits an assault, with or without a deadly weapon. For the consequences of his unlawful acts, he must be held responsible to the same extent and with the same result as others who do not profess to act under the law. Defendants in this case were without authority to arrest deceased or either of his companions in the automobile. They had no warrant authorizing the arrest; no crime had been committed in their presence. They were acting solely upon suspicion, which however well founded they thought it to be, appeared at the trial groundless. The law is no respecter of persons—it holds those who profess to act in its name amenable to its requirements; it seeks to protect even those who may have previously violated its provisions when their rights are put in jeopardy by accusation of crime. It exacts of all men obedience to its mandates, and assures all men—even those suspected of crime—of its protection. No man ought to be deprived of life, liberty or property, except in accordance with its provisions. The judgment is affirmed. There is

No error.

CLARKSON, J., concurring in the result: The peace, quiet and good order of our State depends upon the individual citizen obeying the law of the land as made by the law-governing body. When we lay down at night, walk the streets of a city or town, travel the public highway, or elsewhere, it is the strong arm of the law that is around about us and protects us. Obedience to law is the duty incumbent upon all good citizens. The citizen who is unwilling to obey the law, the governing power has entrusted the enforcement to certain officers to arrest with warrant and, under certain circumstances, without warrant. It goes without saying that the primary duty is upon officers of the law to obey the law. As a rule, these enforcement officers are dealing with a lawless element, dangerous, who have set themselves in defiance to the will of the majority as expressed in our form of government. This element is not lamb-like and no officer is expected to meet a lamb like he would a lion. We cannot judge the enforcement officers as a whole by the misconduct of over-zealous officers exceeding their authority.

In *S. v. Smith,* 127 Iowa, p. 534, *Deemer, J.,* says: "An officer, in the performance of his duty as such, stands on an entirely different footing from an individual. He is a minister of justice, and entitled to

STATE *v.* SIMMONS.

the peculiar protection of the law. Without submission to his authority there is no security, and anarchy reigns supreme. He must, of necessity, be the aggressor, and the law affords him special protection. In his capacity as an individual he may take advantage of the 'first law of nature,' and defend himself against assault; as an officer he has an affirmative duty to perform, and in the performance thereof he should, so long as he keeps within due bounds, be protected. Sentimentalism should not go so far as to obstruct the due administration of law, and brute force should not be permitted to obstruct the wheels of justice."

*Pearson, J.,* in *S. v. Garrett,* 60 N. C., at p. 150, said: "In other words, resistance to the execution of the command of the State, is not allowed. The warrant must be executed *peaceably, if you can, forcibly if you must."*

In *S. v. Pugh,* 101 N. C., at p. 739, it is said: "It was the duty of the defendant to interfere and suppress the fight, and if need be, he might, in good faith, strike a reasonable blow for the purpose. While he had no authority to strike an unnecessary blow, or one greatly in excess of what was necessary for the purpose, and wanton, he was the judge of the force to be applied under the circumstances, and he would not be guilty of an assault and battery unless he arbitrarily and grossly abused the power confided to him, and whether he did or did not was an inquiry to be submitted to the jury, under proper instructions from the court. A grossly unnecessary, excessive and wanton exercise of force would be evidence—strong evidence—of a wilful and malicious purpose, *but the jury ought not to weigh the conduct of the officer as against him in 'gold scales'* (italics mine); the presumption is he acted in good faith. This is the rule applicable in such cases as the present one, as settled in *S. v. Stalcup,* 2 Ired., 50; *S. v. McNinch,* 90 N. C., 696, and the cases there cited. So, also, *S. v. Bland,* 97 N. C., 438."

The good faith of the officers on the occasion and what they did is thus stated succinctly by them: On the evening of 21 November, 1925, a reliable person and a neighbor of Melvin Joyce and John Joyce and Jim Sutphen, came to the office of C. H. Haynes, sheriff of Surry County, and in the presence of the defendant, R. F. Simmons, stated that Melvin Joyce and John Joyce had gone to Virginia for a load of whiskey; that the money had already been raised and that they would pass along the Patrick courthouse road at or near the Sparger home that evening. He further stated to the sheriff, in the presence of Simmons that these parties would be traveling in a Ford roadster, and that a V-shaped hole had been made in the windshield; that the sheriff after receiving this report, requested R. F. Simmons, who was a deputy sheriff, to go and seize the car and the whiskey. R. F. Simmons reported these facts to E. S. Smith, another deputy sheriff, and the two

went to the place designated; that in addition to this information so received R. F. Simmons on a former occasion had found Melvin Joyce with a quart of liquor; that Joyce had undertaken to conceal the liquor; that in addition to this, both of the defendants knew of the general reputation of the said Joyce boys for being blockaders. With this information the two defendants stationed themselves at the point designated; that just before sundown on that evening the defendants about one hundred yards away recognized the car that had been described to them, coming up the road, and on closer inspection recognized the two Joyce boys with Sutphen in the car. The two defendants were standing several yards apart. The defendant, Smith, ran out into the road and waived his hand and ordered the car to stop; the car did not stop, but accelerated the speed. Simmons, whom the occupants admitted they knew to be an officer, ran out in the road in front of the car and waved and ordered them to stop; the car was not stopped. Both of the defendants shot in front of the car trying to stop it, after the order had been given to stop and had been refused. When Simmons ordered them to stop they deflected their car from the part of the road in which they were then traveling towards Simmons, and Simmons was required to jump out of the way to prevent the car from running over him, and in the attempt to escape, accidentally, without his knowledge, the pistol that he had in his hand fired. The car did not then stop, but continued with accelerated speed and never did stop; that the defendants did not have any knowledge that either one of these had been shot until after they came home; that upon subsequent examination of the car, and on the night of the homicide there was a distinct odor of liquor, and there was broken glass under the seat in the car and the arrangement under the seat of the car was of such a character as to show that it had been prepared for the transportation of liquor.

Where an arrest can be made without warrant is stated in *S. v. Godette,* 188 N. C., at p. 503, as follows: "The language of the Conformity (or Turlington) Act of this State, *supra,* is plain: that when an officer of the law shall discover any person transporting or possessing liquor in violation of law, that is when he sees or has absolute personal knowledge, the liquor and vehicle shall be seized and the person in charge arrested. The officer can arrest (1) when he sees the liquor; (2) when he has absolute personal knowledge. The latter is defined in the law. In 9 Gray Mass., 271, 'Knowledge, being a firm belief.' In *West v. Home Ins. Co.* (C. C.), 18 Fed., 6, it was held: 'Personal knowledge— knowledge of the truth in regard to a particular fact or allegation, which is original, and does not depend on information or hearsay.'" This absolute personal knowledge can be acquired through the sense of seeing, hearing, *smelling,* tasting or touching. In Blackmore on Prohi-

bition (1923), p. 332, it is said: 'Under the Federal as well as the State statutes, to justify search and seizure or arrest without warrant the officer must have direct personal knowledge, through his hearing, sight or other sense of the commission of the crime by the accused. But it is not necessary that he should actually see the contraband liquor. . . . (*supra*, p. 334). If an officer sees intoxicating liquor being loaded on an automobile he can thereupon seize the vehicle and arrest the person who has put liquor on it, and other palpable conditions might authorize similar action, as plainly seeing the liquor leaking from a vehicle in which it is being transported, such a leak extending itself upon the public highway and the spirits spreading themselves and their odor along the road," etc.

Transportation of liquor or having liquor in one's possession for the purpose of sale is in North Carolina a misdemeanor. It is held in *S. v. Sigman,* 106 N. C., 728, that "Where a person charged only with a misdemeanor flees from the officer to avoid arrest, the latter is not authorized to take life or shed blood in order to make the arrest. Under such circumstances, if he kills, he will be at least guilty of manslaughter, and he will be guilty of an assault if no actual injury is inflicted if he uses such force as would have amounted to manslaughter had death ensued."

The United States Act in reference to arrest without warrant, says: "An Act Supplemental to the National Prohibition Act," approved 23 November, 1921, chapter 134, 42 Stat. at L., 222, 223, Comp. Stat., sec. 10, 184a, Fed. Stat. Anno. Supp., 1921, p. 230, provides: "That any officer, agent or employee of the United States engaged in the enforcement of this act, or the National Prohibition Act, or any other law of the United States, who shall search any private dwelling as defined in the National Prohibition Act, and occupied as such dwelling, without a warrant directing such search, or *who, while so engaged shall, without a search warrant maliciously and without reasonable cause search any other building or property,* shall be guilty of a misdemeanor, and upon conviction thereof shall be fined for a first offense not more than $1,000, and for a subsequent offense not more than $1,000 or imprisonment not more than one year, or both such fine and imprisonment."

*Chief Justice Taft,* in *Carroll v. U. S.,* 267 U. S., 131 (1924), construing the above statute in regard to arrest without warrant, under the Federal Statute, at p. 160, says: "We know in this way that Grand Rapids is about 152 miles from Detroit, and that Detroit and its neighborhood along the Detroit River, which is the international boundary, is one of the most active centers for introducing illegally into this country spirituous liquors for distribution into the interior. It is

obvious from the evidence that the prohibition agents were engaged in a regular patrol along the important highways from Detroit to Grand Rapids, to stop and seize liquor carried in automobiles. They knew, or had convincing evidence to make them believe, that the Carroll boys, as they called them, were so-called 'bootleggers' in Grand Rapids, i. e., that they were engaged in plying that unlawful trade of selling such liquor in that city. The officers had soon after noted their going from Grand Rapids halfway to Detroit, and attempted to follow them to that city to see where they went, but they escaped observation. Two months later these officers suddenly met the same men on their way westward, presumably from Detroit. The partners in the original combination to sell liquor in Grand Rapids were together in the same automobile they had been in the night when they tried to furnish the whiskey to the officers, which was thus identified as part of the firm equipment. They were coming from the direction of the great source of supply for their stock to Grand Rapids, where they plied their trade. That the officers, when they saw the defendants, believed that they were carrying liquor, we can have no doubt; and we think it is equally clear that they had reasonable cause for thinking so. Emphasis is put by defendants' counsel on the statement made by one of the officers that they were not looking for defendants at the particular time when they appeared. We do not perceive that it has any weight. As soon as they did appear, the officers were entitled to use their reasoning faculties upon all the facts of which they had previous knowledge in respect to the defendants," citing authorities. . . . "In the light of these authorities, and what is shown by this record, it is clear the officers here had justification for the search and seizure. This is to say, that the facts and circumstances within their knowledge, and of which they had reasonably trustworthy information, were sufficient in themselves to warrant a man of reasonable caution in the belief that intoxicating liquor was being transported in the automobile which they stopped and searched."

The act quoted uses the words "maliciously and without reasonable cause"—different from the Turlington Act construed in *Godette's case, supra.*

*Hoke, J.,* in *S. v. Dunning,* 177 N. C., at p. 562, well states the rights of officers, sustained by a wealth of authorities: "It is a principle very generally accepted that an officer, having the right to arrest an offender, may use such force as is necessary to effect his purpose, and to a great extent he is made the judge of the degree of force that may be properly exerted. Called on to deal with violators of the law, and not infrequently to act in the presence of conditions importing serious menace, his conduct in such circumstances is not to be harshly judged, and if

his is withstood, his authority and purpose being made known, he may use the force necessary to overcome resistance and to the extent of taking life if that is required for the proper and efficient performance of his duty. It is when excessive force has been used maliciously or to such a degree as amounts to a wanton abuse of authority that criminal liability will be imputed. The same rule prevails when an officer has a prisoner under lawful arrest and the latter makes forcible effort to free himself; and, in this jurisdiction, the position holds whether the offense charged be a felony or a misdemeanor, the governing principle being based on the unwarranted resistance to lawful authority and not dependent, therefore, on the grade of the offense."

The facts at the time of the occurrence, as stated by the officers, were disputed by the State's witnesses. The court below, under proper instructions, left the matter to the jury. The defendants were convicted and on the record I can find no error, and therefore concur in the opinion that the judgment of the court below should be

Affirmed.